847 F.2d 843
 27 ERC 1697, 270 U.S.App.D.C. 80, 56
USLW 2662,
18 Envtl. L. Rep. 21,118
 CENTER FOR AUTO SAFETY, et al., Petitioners,
v.
Lee M. THOMAS, Administrator, Environmental Protection
Agency, et al., Respondents,
Automobile Importers of America, Inc., Ford Motor Company,
et al., Intervenors.
 No. 85-1515.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc June 4, 1987.
Decided May 17, 1988.
As Amended May 17, 1988.
 
 Cornish F. Hitchcock, with whom Alan B. Morrison, William B. Schultz, and Clarence M. Ditlow, III, were on the brief, for petitioners.
 Raymond B. Ludwiszewski, Sp. Counsel to the Asst. Atty. Gen., U.S. Dept. of Justice, with whom Francis S. Blake, General Counsel, Alan W. Eckert, Associate General Counsel, Peter Wyckoff, Acting Associate General Counsel, Gerald K. Gleason, Asst. General Counsel, Earl Salo, Acting Asst. General Counsel, and Nancy A. Ketcham-Colwill, Counsel, E.P.A., and John F. Cermak, Jr., U.S. Dept. of Justice, were on the briefs, for respondents.
 Edward W. Warren, with whom Arthur F. Sampson, III, John G. Mullan, William L. Weber, Jr., and Thomas L. Arnett (for General Motors Corp.), Charles H. Lockwood, II (for Auto. Importers of America, Inc.), and James A. Brown (for Ford Motor Co.) were on the joint brief, for intervenors. Blake A. Biles, Paula Winkler-Doman, Hal D. Cooper, Dennis M. Kelly, Robert C. Kahrl and Charles P. Murdter also entered appearances, for intervenors.
 Before WALD, Chief Judge, and ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, BORK,* STARR, SILBERMAN, BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.
 Opinion PER CURIAM.
 
 
 1
 Opinion filed by Chief Judge WALD, in which Circuit Judges SPOTTSWOOD W. ROBINSON, III, MIKVA, HARRY T. EDWARDS, and RUTH BADER GINSBURG join.
 
 
 2
 Opinion filed by Circuit Judge BUCKLEY, in which Circuit Judges STARR and D.H. GINSBURG join and Circuit Judge WILLIAMS joins in part.
 
 
 3
 Opinion filed by Circuit Judge SILBERMAN.
 
 
 4
 Opinion filed by Circuit Judge WILLIAMS.
 
 PER CURIAM:
 
 5
 The en banc court, convened to decide the question of whether petitioners have standing to challenge a rule of the Environmental Protection Agency (EPA) adopting new formulae for calculating automobile fuel efficiency, has divided evenly on whether the standing requirement has been met. In view of this even division, the court has decided to reinstate the original panel decision affirming in part and reversing and remanding in part the EPA's rule. This resolution accords with the policy recently adopted by this circuit that generally leaves intact panel decisions until they are vacated by a majority of the en banc court. However, in light of the division of this en banc court on standing, the court has agreed that neither the reinstatement of the panel decision, nor any of the separate opinions that follow, shall be considered as establishing precedent as to any aspect of standing.
 
 
 6
 The en banc court also recognizes that the considerable time it has taken for this appeal to proceed may make it unusually difficult for the manufacturers subject to the EPA's rule to satisfy fuel-economy standards as a result of the retroactively readjusted Corporate Average Fuel Economy credit ratings generated by the panel's decision. The court assumes that the National Highway Transportation Safety Board will within the limits of its discretion take this factor into account in its proceedings on remand.
 
 
 7
 It is so ordered.
 
 
 8
 WALD, Chief Judge, with whom ROBINSON, MIKVA, HARRY T. EDWARDS and RUTH BADER GINSBURG, Circuit Judges, join:
 
 
 9
 The only issue of this appeal being reheard en banc is whether the Center for Auto Safety and two other membership organizations that represent consumers of automobiles have standing to challenge an agency rule that compensates automobile manufacturers retroactively for changes in the testing procedures used to measure the fuel economy of each manufacturer's sales fleet. For reasons to follow, we conclude that they do.
 
 
 10
 In this regard, we differ with Judge Silberman, who would reopen the question of whether automobile consumers can suffer a cognizable injury-in-fact from the reduced production of fuel-efficient vehicles. See infra (opinion of Silberman, J.) (hereinafter "Silberman Opinion"). We also part ways with our four colleagues who have concluded that the petitioners fail to satisfy the causation and redressability prongs of the standing requirement. See infra (opinion of Buckley, J.) (hereinafter "Buckley Opinion"). On this score, we find no constitutionally relevant distinction that differentiates this case from Center for Auto Safety v. National Highway Traffic Safety Administration, 793 F.2d 1322 (D.C.Cir.1986) (CAS I ), a precedent which not only survives this en banc intact but is actively endorsed by all but two members of the en banc court.
 
 
 11
 CAS I held that the same petitioners who have brought this suit had standing to challenge an agency rule that lowered the minimum average fuel economy standards for light trucks promulgated under the Energy Policy and Conservation Act, Pub.L. No. 94-163, 89 Stat. 871 (1975) (codified as amended in 15 & 42 U.S.C.) ("the EPCA" or "the Act"). The panel in that case reasoned that because petitioners complained of vehicles that would be less fuel-efficient, and because the EPCA's standards are designed to make vehicles more fuel-efficient, "[t]he object of the agency's regulation and the injury are thus directly linked." 793 F.2d at 1334-35. Under challenge in today's case is a different agency rule but one that just as surely undermines fuel economy standards. It does so by relaxing fuel-efficiency testing procedures and thereby providing manufacturers with hundreds of millions of dollars in unearned fuel-economy "credits" that permit those manufacturers to fall below the EPCA's standards without fear of sanctions. In refusing to acknowledge that the effect of the agency's unjustified credit awards is the same as an unlawful lowering of the minimum standards, our colleagues repudiate a cause-and-effect relationship which Congress itself identified when after extensive hearings it selected a monetary incentive system as its means of inducing automobile manufacturers to provide for improved energy efficiency of motor vehicles.
 
 
 12
 Despite Congress' selection of a penalty-and-credit incentive system, and despite 12 years of regulatory experience under the Act that underscores the effectiveness of this legislative strategy in promoting fuel economy in automobiles, four of our colleagues conclude today that as a matter of constitutional law the unjustified provision of credits toward meeting the fuel economy minimum standards cannot affect the future availability of energy-efficient cars-- i.e., that no major automobile manufacturer will respond to these regulatory incentives and disincentives in the manner Congress expected. We, however, do not believe that Article III of the Constitution requires or even allows judges to substitute their own counterintuitive views of the economic dynamics at work in the automobile industry for those of Congress, any more than the Fourteenth Amendment "enact[s] Mr. Herbert Spencer's Social Statics," Lochner v. New York, 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). Accordingly, we find that these petitioners have identified a cognizable injury that is both caused by the challenged rule and redressable by this court, and we would hold they have standing to bring this appeal.
 
 I. BACKGROUND
 
 13
 A. The Incentive Structure Established by the EPCA
 
 
 14
 The EPCA was a comprehensive legislative response to the energy shocks of the 1973 oil embargo. It sought "to conserve energy supplies through energy conservation programs" and "to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products." 42 U.S.C. Sec. 6201(4) and (5). Throughout its structure and provisions, the Act reflects Congress' firm conviction that economic actors would respond to economic stimuli.
 
 
 15
 The Act aimed at doubling the 1974 level of automobile fuel efficiency by 1985.[1] Toward that end, Congress established mandatory fleetwide Corporate Average Fuel Economy ("CAFE") standards, which required manufacturers to improve by 50% the fuel economy of their fleets by model year ("MY") 1980 and to double that target by MY 1985. Congress delegated to the Department of Transportation (DOT) responsibility for setting annual CAFE standards for automobiles and light trucks in the intervening years.[2]
 
 
 16
 To assure compliance with this statutory scheme, Congress imposed a system of financial penalties for companies which fell short of annual CAFE standards, which are measured in miles per gallon. 15 U.S.C. Sec. 2007 (defining as "unlawful conduct" failure to comply with average annual fuel economy standards). A manufacturer must pay a penalty of $5 for each tenth of a mile by which it falls short of the standard, multiplied by the number of automobiles in that manufacturer's sales fleet. 15 U.S.C. Sec. 2008(b)(1)(A).
 
 
 17
 Congress, however, also wanted to encourage manufacturers to exceed the annual minimum CAFE requirements, and so it provided them with flexibility in planning their production to meet the Act's increasing fuel economy standards. It allowed them to carry their surplus CAFE credits forward and backward to other model years. 15 U.S.C. Sec. 2002(l )(1)(A). Thus, if a manufacturer's CAFE rating for a given year exceeds the minimum requirement for that year, the manufacturer earns CAFE credits (one credit per tenth of a mile by which the standard has been surpassed, multiplied by the number of automobiles it has manufactured that model year). Those credits are then available to offset any penalties incurred in the preceding three model years, or as a cushion against future deficiencies in the subsequent three model years. 15 U.S.C. Sec. 2007(b). In sum, credits earned in any particular year have a six-year model year life during which they permit a manufacturer to fall below CAFE requirements.[3]
 
 
 18
 The EPCA vests the Environmental Protection Agency (EPA) with responsibility for conducting the fuel-economy tests on automobile models. In conducting such tests, the agency may use either the procedures utilized for MY 1975, or it may develop testing and calculation procedures "which yield comparable results." 15 U.S.C. Sec. 2003(d)(1). By inserting the comparability requirement, Congress meant to insure that auto manufacturers be credited only with real fuel economy gains, not illusory gains generated by changes in test procedures. To give manufacturers sufficient lead time, Congress also required the EPA to promulgate any revisions in testing procedures other than technical or clerical changes "not less than 12 months prior to the model year to which such procedures apply." 15 U.S.C. Sec. 2003(d)(3).
 
 B. The Background of This Appeal
 
 19
 In 1979, Ford Motor Company ("Ford") and General Motors Corporation ("GM") filed petitions for rulemaking with the EPA. The automobile manufacturers alleged that changes in the EPA's testing procedures since MY 1975 had caused their CAFE ratings to be lower than they would have been under original testing procedures. The companies argued that, although the Act permits changes in testing procedures, Sec. 2003(d)(1) requires the agency to make appropriate adjustments to insure that the resulting fuel economy averages are "comparable" to results which could have been attained under 1975 procedures.
 
 
 20
 The Administrator of the EPA denied the companies' request, and the companies appealed to the Court of Appeals for the Sixth Circuit. That court remanded the case to the EPA to initiate a rulemaking that would establish an "adjustment factor" reconciling current test procedures with previous ones. See General Motors Corp. v. Costle, Nos. 80-3271, 80-3272, & 80-3655, mem. order (6th Cir.1982); see also General Motors Corp. v. Costle, 698 F.2d 1219 (6th Cir.1982). The court's order left it to the EPA to determine which test procedures required adjustment, and by how much.
 
 
 21
 In July 1985, the EPA, having reviewed technical data and heard public comment, completed its rulemaking. It granted manufacturer-specific CAFE adjustments to compensate for the adverse impacts of certain changes in test procedures adopted after 1975. These new CAFE adjustment equations applied to automobile CAFE ratings from MY 1980 through MY 1984. The EPA also adopted one prospective-only adjustment, and established regulations designed to maintain the stringency of the CAFE standards in future model years. See 48 Fed.Reg. 56,526 (1983) (notice of proposed rulemaking); 49 Fed.Reg. 48,024 (1984) (supplemental notice of proposed rulemaking); 50 Fed.Reg. 27,172 (1985) (final rule).
 
 
 22
 The effect of these rulings was to provide Ford and GM with CAFE credits worth hundreds of millions of dollars. No complete figures totalling those credits can be found in the record of this case, but a December 1985 letter from NHTSA to GM is instructive. It estimated that the retroactive change in testing procedures would draw down GM's net liability in MY 1984 (when GM failed to meet the CAFE standards) to $508.7 million from its previous level of $629.8 million, while increasing GM's net credit surplus in MY 1981 and MY 1982 (when GM exceeded the CAFE standards) to $462.4 from $274.2 million. See Letter from Administrator of NHTSA to GM (Dec. 30, 1985) (reprinted in Addendum to Reply Brief for Petitioners).
 
 
 23
 The petitioners in this action, filed on August 20, 1985 in this court pursuant to 15 U.S.C. Sec. 2004(a), are four nonprofit membership organizations that promote energy conservation. Three of these groups--the Center for Auto Safety, Public Citizen, and the Union of Concerned Scientists--argue that if the EPA's adjustments are left intact, their members will be injured
 
 
 24
 because [the rule] retroactively gives manufacturers credits for higher fuel economy ratings which are worth an estimated $540 million to General Motors and $245 million to Ford. These credits, which relieve manufacturers from liability for their failure to meet federal mileage standards, diminish manufacturers' incentives to develop and market a wider range of fuel-efficient vehicles sought by petitioners' members.
 
 
 25
 Brief for Petitioners at 43. In short, "consumers are injured because automobiles save less energy and use more gasoline than Congress intended." Supplemental Brief for Petitioners on Rehearing En Banc at 7. The fourth petitioner, Environmental Policy Institute, alleges that its "institutional interests in promoting conservation in [the automobile] and other industries are adversely affected by the EPA's decision, insofar as it diminishes incentives for conservation in this industry, which is a major user of petroleum." Id. at 5.
 
 
 26
 The essence of the claims of these groups is (1) that the EPA lacked authority to promulgate retroactive CAFE adjustments, because the EPCA requires the agency to provide 12 months notice before making such changes in "testing or calculation procedures," see Sec. 2003(d)(3); and (2) that it was unlawful for the EPA retroactively to apply adjustments favorable to automobile manufacturers at the same time it refused to apply retroactively negative CAFE adjustments reflecting changes in testing procedures that may have unduly benefitted manufacturers. The petitioners offered two examples of negative adjustments that if applied would decrease past CAFE credits but which the EPA proposed to apply only prospectively: one dealing with road load power settings and the other with mileage accumulation limits. It is conceded that if the EPA made these negative adjustments retroactive, most or all of the positive CAFE adjustments awarded to manufacturers under the new rulemaking would have cancelled out.
 
 
 27
 In an opinion issued December 2, 1986, a panel of this court, relying on CAS I, unanimously held that petitioners had standing to bring suit and that the EPA's refusal to make retroactive negative adjustments in CAFE ratings was error. In so concluding, the panel wrote that "[t]he EPA's decision to award manufacturers CAFE credits ... and to refrain from debiting them for retroactive changes, removes substantial financial incentives to produce more fuel-efficient vehicles in the future." See Center for Auto Safety v. Thomas, 806 F.2d 1071, 1075 (D.C.Cir.1986).[4]
 
 
 28
 On February 6, 1987, the full court vacated the panel opinion and granted rehearing en banc, limited to the question: "Does the Center for Auto Safety have standing to challenge the EPA's actions at issue in this case?" See Center for Auto Safety v. Thomas, 810 F.2d 302 (1987). To that question we now turn.
 
 II. STANDING
 A. Overview
 
 29
 The requirement that a litigant have standing to invoke the power of a federal court "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Supreme Court has construed the constitutional limitations, which emanate from the "case or controversy" language of Article III, as containing three distinct yet interrelated requirements. A litigant must demonstrate (1) an actual or threatened injury (2) traceable to the challenged action and (3) likely to be redressed by a favorable decision. The prudential limitations on standing include general prohibitions on a litigant's asserting another person's legal rights and on the adjudication of generalized grievances, as well as the requirement that a plaintiff's complaint fall within the "zone of interests" of the law in question. See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted); Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 30
 This case involves only the constitutional components of the standing requirement. Congress may eclipse prudential standing limitations by "grant[ing] an express right of action to persons who would otherwise be barred by prudential standing rules." See Warth, 422 U.S. at 501, 95 S.Ct. at 2206. As this court has held, Congress did precisely that here, by including in the EPCA a provision entitling "[a]ny person who may be adversely affected" by an agency rule passed pursuant to the Act to seek review. 15 U.S.C. Sec. 2004(a) (1982). See CAS I, 793 F.2d at 1336 ("EPCA clearly removes the judicial authority to create prudential barriers"); see also id. at 1336-37 (listing numerous cases construing similar provisions to eclipse the prudential standing barrier); National Wildlife Federation v. Hodel, 839 F.2d 694, 704 n. 7 (D.C.Cir.1988) (also construing statutory provision authorizing suits by "adversely affected" persons to obviate prudential standing limitations). We therefore need evaluate petitioners' standing only in light of Article III's requirements.[5]
 
 B. Constitutional Standing
 
 31
 Three of the four petitioners in this case--the Center for Auto Safety (CAS), Public Citizen, and the Union of Concerned Scientists (UCS)--are organizations which represent automobile consumers, on whose behalf they claim standing. The essence of these organizations' complaints is that the provision of fuel-economy credits to Ford and GM will reduce the companies' incentive to develop and market the fuel-efficient vehicles sought by organization members. See supra. If the EPA's final rule is set aside and its provisions of credits rescinded, these petitioners argue, this fuel-saving incentive will be restored and the interest of their members in purchasing the most fuel-efficient vehicles possible will be vindicated.[6]
 
 
 32
 In International Union, UAW v. Brock, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Supreme Court recently reaffirmed the three-part test for representational standing initially set forth in Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):
 
 
 33
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 34
 UAW, 477 U.S. at 282, 106 S.Ct. at 2525 (quoting Hunt, 432 U.S. at 343, 97 S.Ct. at 2441). In this case, as in CAS I, it is undisputed that these petitioners satisfy the second and third prongs of the Hunt-UAW test, see CAS I, 793 F.2d at 1329.[7] Their standing therefore turns solely on whether the organizations' members satisfy the three prongs of the constitutional standing requirement--injury-in-fact, causation, and redressability--in their own right.
 
 1. Injury-In-Fact
 
 35
 The injury which CAS asserts on behalf of its automobile-consumer members is the diminished availability and price in the automobile market of fuel-efficient vehicles. That is precisely the same injury that a panel of our court (including Judge Buckley) held cognizable in CAS I, 793 F.2d at 1331-34, an opinion whose result and reasoning we reaffirm today. Indeed, eight of the ten members of our court sitting on this appeal reaffirm not only CAS I in general, but the constitutional validity of this particular injury. See Buckley Opinion at 867-68. A ninth member, Judge Williams, reserves judgment on the injury-in-fact question. We therefore focus on injury only to address the alternative and more parsimonious vision of the injury-in-fact requirement offered by the tenth member, Judge Silberman, in his separate opinion.
 
 
 36
 The essence of Judge Silberman's argument is that CAS has failed to describe with adequate specificity the injury befalling its members. Of the harm CAS has described, he asks, "can it seriously be maintained that the failure to develop a larger number of Ford models than presently exist has resulted in a 'distinct and palpable,' 'particular and concrete,' 'specific and objective' injury?" Silberman Opinion at 878 (emphasis in original). What petitioners have failed to do, Judge Silberman states, is to "identify any particular model, component or performance standard their members seek but cannot find." Id. at 877. From such a failure he concludes that "[t]his is really the case of the missing plaintiff," id. at 882, and that the claim CAS advances here can only be regarded as seeking to vindicate "a political or ideological interest," id., and hence noncognizable under Valley Forge, 454 U.S. at 482-87, 102 S.Ct. at 763-66.
 
 
 37
 Judge Silberman, however, attacks a straw man. To Judge Silberman, the only injury befalling automobile consumers is "the failure of automobile manufacturers 'to develop and market a wider range of fuel-efficient vehicles.' " Id. at 877 (quoting, and adding emphasis to, Brief for Petitioners at 5). But that is only a small part of the story. In addition to protesting the diminished range of fuel-saving cars, CAS has also alleged that when NHTSA impermissibly lowers a fuel economy standard, or when the EPA takes actions like the one challenged here that encourage manufacturers to overstate the fuel economy of their fleet in measuring it against the Act's goals, there results a diminished number of fuel-saving cars. Those consumers who are shut out or priced out of this constricted market "are injured because [their] automobiles save less energy and use more gasoline than Congress intended." Supplemental Brief for Petitioners on Rehearing En Banc at 7.[8]
 
 
 38
 What CAS is saying is simply that, as a result of the EPA's illegal action, its members will have to pay more money to obtain identical mileage. Judge Silberman's caricature notwithstanding, this injury is apart from the sheer number of vehicle models available, and it occurs in one of two ways. First, those consumers seeking to buy fuel-efficient cars will find that the prices of all cars more fuel-efficient than the EPA's CAFE goal have generally been driven up. This result adheres because, after EPA's rule bestowing a bank of CAFE credits on automobile manufacturers, they will have less incentive to manufacture as large a supply of such fuel-efficient cars. As the supply of a good drops, demand remaining constant, the laws of supply and demand would ordinarily suggest its price will rise.[9] Second, those automobile consumers who have purchased cars that are relatively less fuel-efficient as a result of auto makers' changed offerings and prices will require more gasoline and therefore pay more money for fuel.[10]
 
 
 39
 Price increases like these are classically cognizable economic injuries. See, e.g., Bryant v. Yellen, 447 U.S. 352, 357 & n. 17, 100 S.Ct. 2232, 2235 & n. 17, 65 L.Ed.2d 184 (1980) (residents and would-be purchasers injured by higher farmland prices). Indeed, our circuit has repeatedly recognized that consumers alleging higher prices as a result of government action have pleaded a valid injury-in-fact. See, e.g., Common Cause v. Department of Energy, 702 F.2d 245, 250-51 (1983) (consumers of "energy products" who challenged energy-consumption practices of federal government and alleged "shortages and higher prices of energy products" stated cognizable injury-in-fact); State of Illinois v. Bristol-Myers Co., 470 F.2d 1276, 1278 (D.C.Cir.1972) (state has standing to challenge alleged Sherman Act violations of drug manufacturer on behalf of private consumers who would be injured by higher prices of prescription drugs); Goodman v. Public Service Commission, 467 F.2d 375, 378 (D.C.Cir.1972) (consumer has standing to challenge electric company's price increase); see also Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093, 1096-97 (D.C.Cir.1970) (footnotes omitted) ("[c]onsumers of regulated products and services have standing to protect the public interest in the proper administration of a regulatory system enacted for their benefits. The interest asserted in such a challenge to administrative action need not be economic"). This position derives strength from the Supreme Court's admonition that injuries are no less cognizable because they befall the many, not the few. See note 5, supra. And it draws support from the long line of cases in which consumers have been found to have standing to challenge broadly suffered noneconomic injuries. See, e.g., Cutler v. Hayes, 818 F.2d 879, 887-90 (D.C.Cir.1987) (consumers concerned about safety and effectiveness of over-the-counter drugs have standing to challenge certain Food & Drug Administration regulations); Consumers Union of United States, Inc. v. Federal Trade Commission, 691 F.2d 575 (D.C.Cir.1982) ("consumers, in this instance, used-car purchasers, have standing to challenge legislative veto that scuttled an agency rule that would require disclosure "that would assist them in making informed purchasing decisions").
 
 
 40
 Now one may, as does Judge Buckley, mount an attack on petitioners' standing on the theory that any such price increases are so indirectly related to the EPA's action that they may never occur, and so cannot survive the Supreme Court's "substantial likelihood" test for causation. See infra; see also Common Cause, 702 F.2d at 252 (finding injury-in-fact but denying standing to consumer litigants alleging price injury because chain of events alleged to produce price increases was "conjectural at best"). But it is far too late in the day to question a price increase befalling a consumer as a result of state action as a cognizable injury. Suppose for a moment that the EPA rule under challenge had been a simple order requiring auto manufacturers to add $100 to the sticker prices of all cars whose performance exceeded the annual fleet fuel economy average. Could anyone seriously question that the resulting price increase would be cognizable?[11]
 
 
 41
 Judge Silberman evades grappling with the price-increase injury, and instead confines himself to CAS's separate allegation that the EPA's action is likely to deter production of a "wider range" of automobiles. On that score, he faults CAS for failing to identify the particular models and components whose diminution--or, presumably, whose enhanced prices--its members fear: "a station wagon that achieves over 33 miles per gallon, or a subcompact that gets 45 miles a gallon, or a car with a more efficient automatic transmission system." Silberman Opinion at 3. Make no mistake about the result of this addition to the standing requirement: it would render wholly nonjusticiable all consumer claims raised under the EPCA. For until Ford and GM actually settle upon business strategies for how to alter their production and pricing (and thereby reduce their fuel-economy averages) in response to the EPA's provision of fuel economy credits, no consumer could say with certainty which particular models and components will be phased out and which will evade the boardroom executioner. All a consumer could realistically conclude is that the class of relatively fuel-efficient cars will as a collectivity suffer.
 
 
 42
 To be sure, his complaint could guess at the vehicular victims: the 33 mpg station wagon, for example, or the gas-stingy subcompact, or the pink Cadillac with crushed velvet seats. But requiring the naming of automobile types for the mere sake of the appearance of specificity would be just the sort of "mechanical exercise" in applying the standing requirement that the Supreme Court has quite recently warned against. See Pennell v. City of San Jose, --- U.S. ----, ----, 108 S.Ct. 849, 854, 99 L.Ed.2d 1 (1988) (majority opinion of Rehnquist, C.J.) (quoting Allen, 468 U.S. at 751, 104 S.Ct. at 3324). It would be an especially empty gesture because CAS's consumer members pointedly disavow reflexive brand loyalty in favor of value, a concept that is meaningless before one knows the price of a particular item. And because no one could say it is substantially likely that a particular model will be deemphasized--even though many models are likely to be, and even though the aggregate production of the more fuel-efficient members of a manufacturer's fleet is almost certain to drop--the "33 mpg station wagon" complaint would ultimately fail the causation prong of the standing requirement. Between the Scylla of the imprecise injury and the Charybdis of the uncertain occurrence, all consumer complaints based on the EPCA would founder.
 
 
 43
 That would be a remarkable result. For while it is true that there may be causes of action which no one has standing to bring, see Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767, the Supreme Court has never found such total nonjusticiability in a case in which petitioners alleged tangible economic (as opposed to ideological or psychological) injury, or for that matter in a case involving a statute in which Congress had eliminated all prudential barriers to standing. See supra. This is no generalized grievance based simply on taxpayer status, as in Valley Forge, nor an abstract ideological complaint grounded in citizen status, as in Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). It is a complaint lodged by an identifiable group of people who fear a specific economic injury: reduced car availability, and higher car and gas prices.[12]
 
 
 44
 Despite Judge Silberman's call for precision prognostication in pleading, he shrugs off the very case authority that most surely disposes of his argument. For while he derives much rhetorical mileage from the various verbal formulations with which the injury-in-fact requirement has been characterized--that an injury be "distinct and palpable," "particular and concrete," "specific and objective," and so forth, see, e.g., Silberman Opinion at 876--when he comes to consider the actual holdings of the cases involving environmental grievances in which the Supreme Court has given much of its applied content to those standing-doctrine adjectives, his embrace of authority becomes far less enthusiastic. Consider the following passage:
 
 
 45
 I do not believe the reasoning of these [environmental] cases applies where, as here, only a consumer interest is asserted, for there appears to be some tension between the Supreme Court's standing analysis used in environmental cases and that employed in virtually all other cases.... [T]he court has assumed sub silentio that all parts of the environment are unique and precious to those parts.
 
 
 46
 ... [T]o extend the environmental concept of injury over the consumer preferences would be to trivialize it. An automobile or a particular brand of wrist-watch or even a kind of battery may be unique in some sense and thus gain consumer loyalty, but to say a reduction in its supply causes injury as does the threatened disappearance of a species is to confuse the variety of goods manufactured by man with that which nature produces. In poetic terms, since "only God can make a tree," a person who enjoys sitting under it is uniquely injured by its destruction; man cannot replace that exact tree.
 
 
 47
 Id. at 883-84 (citations and footnotes omitted).
 
 
 48
 No authority of which we are aware even remotely supports the hierarchy of Article III values which Judge Silberman, relying on the "sub silentio" assumptions of the Supreme Court, would enshrine. Putting aside the metaphysical difficulties of causation analysis that a judicial distinction between God-created items and manmade goods would involve,[13] the elevation of nonmonetizable environmental interests over all others is his theory alone. Case authority on standing jurisprudence if anything suggests the opposite, i.e., the historic primacy of injuries to economic interests. See, e.g., Valley Forge, 454 U.S. at 486, 102 S.Ct. at 765-66. Only with the explosion of environmental litigation in the past two decades did the Supreme Court, in cases like Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), and Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), formally recognize the equal legitimacy of aesthetic and environmental values. See, e.g., SCRAP, 412 U.S. at 686, 93 S.Ct. at 2415 ("standing [is] not confined to those who could show 'economic harm' "). It would be surprising indeed to find that those interests had, sub rosa, overtaken economic interests in the Supreme Court's pantheon of Article III values to the point where a more liberal test of cognizability governs them alone.
 
 
 49
 The fact is that the reduction of options from which a consumer can select in the automobile marketplace, even before it is possible to identify precisely which options will diminish or disappear, is an injury that comfortably accords with the Supreme Court's standing precedents. The cases presenting the most compelling analogy are obviously those involving the government-provoked diminution of unspecified environmental riches. The student plaintiffs in SCRAP pinpointed no particular tree, or even a particular park, and indeed no area smaller than the city of Washington, D.C., which they feared would be ultimately marred by litter as a result of the railroad rate increase they challenged. The wildlife conservation groups in Japan Whaling Association identified no particular whales, or species of whales, or whale habitat smaller than the North Pacific in complaining about American under-enforcement of statutory whaling quotas. Yet both those groups had standing. The consumers who complained of higher prices in Common Cause did not identify specific goods, but rather complained generally about higher prices for "energy products." 702 F.2d at 251. They too pleaded a cognizable injury-in-fact.
 
 
 50
 We could go on, but the broader point is that the standing requirement is not meant to reserve the federal courts for the clairvoyant. The petitioners here have asserted that they are likely to pay higher prices for, and have greater difficulty finding, the fuel-efficient vehicles they desire if the EPA's action stands. That injury, as we held in CAS I and reaffirm today, is enough.
 
 2. Causation and Redressability
 
 51
 The second, causation prong of the constitutional standing requirement mandates that the injury alleged be "fairly traceable" to the allegedly illegal conduct under review. See Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758. The third prong, redressability, asks whether the relief requested is likely to redress the alleged injuries. Id. Because the causation and redressability inquiries substantially overlap where, as here, the relief requested is merely the cessation of illegal conduct, see Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. Haitian Refugee Center v. Gracey, 809 F.2d 794, 801 (D.C.Cir.1987), we address causation and redressability together. However, we postpone until the end of our analysis a unique redressability concern created by the length of time it has taken this appeal to proceed.
 
 
 52
 In CAS I, we held that the injuries to automobile consumers alleged by petitioners were fairly traceable to NHTSA's actions directly lowering fuel-efficiency standards. Petitioners here urge that the same injuries can fairly be traced to the EPA's decision to adjust testing procedures and thereby award CAFE credits worth hundreds of millions of dollars to Ford and GM. The EPA, along with our four colleagues, urges, however, that the relaxation of automobile testing procedures applicable in previous years could not have affected the automobile companies' behavior after August 20, 1985, the date petitioners filed their petition for review of the July 1, 1985 final order. See Buckley Opinion at 871-72. Thus, it is argued that the EPA's rule, whether or not legally correct, could have caused no injury.
 
 
 53
 We find that the petitioners have satisfied the causation requirement in this case. It is hornbook law that a litigant need not prove causation with absolute certainty in order to have standing: only a "substantial likelihood" that the allegedly unlawful action would cause injury is required. Duke Power Co., 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20 (1978); Warth, 422 U.S. at 504, 95 S.Ct. at 2208 (1975). Thus, in 1978 the Supreme Court synthesized its past standing decisions and concluded: "[n]othing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief." Duke Power Co., 438 U.S. at 78, 98 S.Ct. at 2633. The Court's decisions upholding standing in the ensuing decade have, if anything, underscored the importance of maintaining a practical reading of the causation requirement that mandates not a certain cause-and-effect relationship between government action and alleged injury, but rather only a substantially likely one.[14]
 
 
 54
 The intervenors' suggestions to the contrary, the causation requirement is not more rigid when the injury alleged is one that would be worked through the intervention or action of a third party: here, the automobile manufacturer responding to the CAFE credits generated by the EPA's relaxed testing procedures. Rather, the "substantial likelihood" standard governs such cases as well. As we have recently observed, "[t]he Supreme Court's decisions on this point show that mere indirectness of causation is no barrier to standing, and thus an injury worked on one party by another through a third party intermediary may suffice." National Wildlife Federation ("NWF"), 839 F.2d at 705, (citing, inter alia, Meese v. Keene, --- U.S. ----, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1986); Japan Whaling Association; and Duke Power Co.). See also NWF, 839 F.2d at 706-09; Humane Society v. Hodel, 840 F.2d 45, 51 n. 5 (D.C.Cir.1988).
 
 
 55
 We have little difficulty concluding that the EPA's decision retroactively to relax aspects of its testing procedures is "substantially likely," see Duke Power Co., 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, to lessen the availability of fuel-efficient cars to petitioners' consumer members. The central fact about the EPA's final rule is that it results in the provision to Ford and GM of CAFE credits worth hundreds of millions of dollars. Not only common sense and elementary economic logic, but also congressional fact-finding compel the conclusion here that the receipt of these massive credits will almost certainly diminish the future (i.e., post-August 1985) availability of fuel-efficient cars to consumers.
 
 
 56
 In passing, and amending, the EPCA, Congress repeatedly stated that the Act's credit carryforward and carrybackward provisions were designed to work in tandem with the annual fuel-economy standards to induce the production of more fuel-efficient vehicles. Indeed, the legislative history of the EPCA and its amendments makes abundantly clear Congress' assumption that the penalty-and-credit enforcement mechanisms would induce auto makers to exceed minimum fuel standards in order to compensate for unanticipated deficiencies in other years. Thus, if either insufficient penalties are assessed, or excessive CAFE credits are awarded, Congress' objectives will equally be frustrated.
 
 
 57
 The House Committee report on the 1980 EPCA amendment that extended the carryback-carryforward period from one to three years depicts the credit provision as an integral part of an incentive system intended to promote automotive fuel efficiency:
 
 
 58
 The Committee stresses that the objective of the [extended credit-carrying period] proposal is to improve flexibility, provide better planning and encourage the manufacturers to exceed the standards.... As a matter of fact, the Committee believes these changes will act as an incentive to manufacturers to exceed the standards now set whenever they can in order to build up credits to act as safeguards against shortfalls that might occur in the future.
 
 
 59
 H.R.Rep. No. 1026, 96th Cong., 2d Sess. 19-20 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3845, 3858 (emphasis added). There is no question but that the penalties and credits were designed as regulatory carrots and sticks to "provide greater incentives for exceeding standards and ... provide greater flexibility to manufacturers in developing plans to meet standards." Id. at 19, U.S.Code Cong. & Admin.News 1980, p. 3858 (emphasis added); see also id. at 10-11, U.S.Code Cong. & Admin.News 1980, p. 3849 ("With these amendment, manufacturers should have sufficient flexibility to achieve automobile fuel economy standards and, hopefully, to do better. The Committee expects them to do so.") (emphasis added). The Senate Committee report likewise notes that the credit carryforward system would encourage manufacturers who had fallen short of CAFE standards within the previous three years to exceed them in the present year or in future years, rather than simply pay a "massive civil penalty." See S.Rep. No. 642, 96th Cong., 2d Sess. 7 (1980).
 
 
 60
 We are consequently confounded by statements of our colleagues opposing standing that the credit carryback and carryforward provisions of the Act were not at all designed to be "technology-forcing," see Buckley Opinion at 875, but solely to accommodate "considerations of fairness and the need for flexibility," see id. at 875. The legislative history, as well as economic and just plain common sense (the latter two are not always coextensive) flatly contradict any such assertion. The penalty-and-credit provisions were specifically aimed at modifying the behavior of car manufacturers, in order to accomplish the fuel-saving objectives of Congress. Indeed, CAS I itself--a precedent embraced by our four colleagues--recognizes that the penalty-and-credit provisions are inseparable parts of a statutory package geared toward spurring enhanced fuel-economy:
 
 
 61
 EPCA's system of penalties, coupled with credits that can be carried forward or backward three years, serves to force manufacturers to make improvements in the future if they fail to make them in the present.
 
 
 62
 793 F.2d at 1334 (emphasis added).
 
 
 63
 Congress' determination that its credit-penalty carryover system would in fact spur fuel-economy gains deserves considerable deference. In refusing to credit Congress' fact-finding, our colleagues blink a long line of decisions relying on such legislative determinations in the context of standing inquires. See, e.g., NWF, 839 F.2d at 708-09 ("while Congress cannot create standing on its own, it can provide legislative assessments which courts can credit in making standing determinations"); Autolog v. Regan, 731 F.2d 25, 26, 31 (D.C.Cir.1984) ("[T]he premise that exclusion of foreign flag shippers will prompt domestic shippers to exploit existing markets for coastwise shipping undergirds the structure of the coastwise laws; we must give great weight to this congressional finding in our standing inquiry."); International Ladies Garment Workers Union v. Donovan, 722 F.2d 795, 811-12 (D.C.Cir.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984) ("ILGWU ") ("[A]s Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act."); Animal Welfare Institute v. Kreps, 561 F.2d 1002, 1010 (D.C.Cir.1977) ("Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices."). The issue is not whether "Congress [can] abrogate the Art. III minima." See Buckley Opinion at 874. It is rather whether, in appraising the likely impact of a complex economic regulatory scheme, the federal judiciary should override congressional factfinding and substitute its own predictions.[15]
 
 
 64
 Congressional fact-finding in the standing context of this case carries special weight because it is supported by elementary economic logic and by more than a decade of validating experience in which auto manufacturers have responded to a surplus of CAFE credits by falling short of fuel-economy standards in subsequent years.[16] The retroactive credits awarded in this case just as surely altered the economic calculus on which Ford and GM based their fuel-economy decisions after August 1985. Just as penalizing a company for falling short of NHTSA's MY 1984 fuel-economy goals creates an economic incentive for it to exceed standards in MYs 1985, 1986 and 1987, the EPA's decision to draw down Ford's and GM's MY 1984 and MY 1985 debits reduces the incentives for these companies to exceed fuel economy standards during the three-year carryforward periods that run through MY 1987 and 1988, respectively. The EPA's decision bestowing such credits would thus seem, as in CAS I, to make it "substantially likel[y]," see Duke Power Co., 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, that the beneficiaries will produce fewer fuel-efficient cars in MY 1987 and MY 1988, thereby causing the loss of consumer opportunities alleged by petitioners. See also CAS I, 793 F.2d at 1334-35 ("if setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless").
 
 
 65
 This likelihood is enhanced by the record fact that Ford and GM have separately told NHTSA that they will not engage in "unlawful conduct" under 15 U.S.C. Sec. 2008, including allowing their fleets to fall short of CAFE standards in the absence of sufficient credits to avoid paying penalties. See, e.g., Statement of General Motors Corp. to NHTSA, Aug. 8, 1985, at 5 ("GM does not consider the payment of civil penalties to be a reasonable alternative"); Statement of Ford Motor Co. to NHTSA, Aug. 8, 1985, at 7 ("Ford, along with others, have said [sic] many times that the 'unlawful conduct' provision of EPCA precludes planning to pay fines as an alternative to CAFE compliance.... [W]e reaffirm that position today") (both statements included in Addendum to Reply Brief for Petitioners). This means that without the challenged credits, both Ford and GM would almost certainly have moved aggressively to produce more fuel-efficient cars.
 
 
 66
 The principal objection to this causation rationale raised by our four colleagues opposing standing turns on the long lead times supposedly required for new automobiles to be designed. These lead times are said to make it "highly unlikely" that the downward adjustment of credits by the EPA for MY 1984 and MY 1985 would "force the manufacturers to redesign MY 1987 and MY 1988 autos." Buckley Opinion at 19. That argument fails. First, by misapprehending the operation of the credit carryback-carryforward provisions of the EPCA, it underestimates the future impact of the provision of compensatory credits. Secondly, it ignores the undisputed reality that as of August 20, 1985--the date petitioners sought review of the EPA's order, and thus the initially relevant time at which petitioners' standing is to be analyzed--Ford and GM could have immediately taken numerous steps short of a wholesale "redesign" of their vehicles that would have benefitted fuel economy minded future car owners and compensated for the downward adjustments petitioners demanded. The most obvious such step was, of course, to increase the supply of the more fuel-efficient vehicles. These options, in fact, still existed as of the time the panel opinion issued in December 1986.
 
 
 67
 Our colleagues assume that MY 1987 and MY 1988 are the outside years in which a change in Ford's and GM's MY 1984 and MY 1985 fuel-economy credits could affect the auto manufacturers' behavior under the carryforward scheme. That assumption, however, is wrong. The EPCA's provision allowing credits to be carried backward three years and forward three years means that the provision of credits for any given year can have repercussions over the next six years, a fact we illustrate by evaluating the effect of the MY 1984 credits as an example. Petitioners seek to rescind the credits allegedly improperly granted to Ford and GM in MY 1984. In order to make up the deficit aggravated by that rescission, the companies would in essence have to "mortgage" any credits they might earn through successful fuel-economies gained in MYs 1985, 1986 and 1987; that is, they would have to carry back these expected credits. As a result, any such credits would not be available to be carried forward from those years to MYs 1988, 1989 and 1990 as they otherwise might have been. (By the same token, rescission of the MY 1985 credits granted by EPA would affect fuel-economy incentives through MY 1991.) Whatever the barriers to changing MY 1987 and MY 1988 vehicles as of August 20, 1985, it is uncontested that, by MY 1990 and MY 1991, the auto manufacturers could have redesigned their vehicle offerings to enhance fuel economy.
 
 
 68
 Thus, rescinding the massive fuel-economy credits earned by Ford and GM in MY 1984 and MY 1985 makes it substantially more likely that the automobile companies will work to enhance fuel-efficiency in their products in the ensuing six motor-vehicle years. By granting the relief petitioners seek, this court would strip Ford and GM of credits which it could otherwise utilize in the event of a future technological rainy day. Only by generating real fuel-economy gains in the period ending in MY 1991 could the auto manufacturers offset the resulting debits. Such real gains would squarely redress the injury alleged by petitioners.[17]
 
 
 69
 In any event, our colleagues' causation and redressability argument against standing, even within their own myopic time frame, is faulty. They claim that at the time petitioners filed for review in August 1985, only 18 months remained before MY 1987 cars were unveiled and only 30 months remained before MY 1988 cars were introduced--too short a time to allow manufacturers to "redesign" planned automobiles so as to introduce fuel-economies. See Buckley Opinion at 872. Thus, after August 1985 a manufacturer could only make "a short-term business decision, not a long-range planning decision" with respect to MY 1987 and MY 1988 vehicles. Id. at 873.
 
 
 70
 The record provides ample refutation of this aspect of their standing analysis. Although in August 1985 automobile manufacturers may not have been able to "redesign" MY 1987 or MY 1988 vehicles, they could have increased the supply offered of fuel-efficient cars, and they indisputably could have still made important fuel saving changes in their models within that time frame. To meet the standing requirement petitioners need only show a substantial likelihood that auto makers could have taken any steps in response to improve the overall fuel-economy of their MY 1987 and MY 1988 offerings, and thereby partially redressed petitioners' injuries. This they have done.
 
 
 71
 NHTSA's October 1986 report setting forth its fuel economy standards for MY 1987 and MY 1988 demonstrates unambiguously that Ford and GM had the capacity to make short-term modifications that, while technologically modest, would still have enhanced the fuel economy of their MY 1987 and MY 1988 automobiles. See Passenger Automobile Average Fuel Economy Standards for Model Years 1987-88, 51 Fed.Reg. 35,583ff. The specific changes in particular car lines that manufacturers could have made through the application of existing technology included the "install[ation of] a higher number of 4-speed transmissions in certain midsize cars for MY 1987," id. at 35,607; "additional material substitution," id.; the decrease in [aerodynamic] drag coefficients," id., and the "further penetration of front-wheel drive," id. at 35,611. See also id. at 35,606 (summarizing "cost-effective changes practicable for MY 1987 and MY 1988). A Department of Energy report noted by NHTSA confirms the potential for fuel-saving modifications short of redesign, stating that "many technologies that are cost-effective to the consumer have not been introduced in several models in the large and intermediate size classes." Id. at 35,598.
 
 
 72
 While ultimately concluding that these modifications did not warrant NHTSA's raising its estimation of the "maximum feasible" fleetwide averages, the NHTSA report is nonetheless sufficient to show that it was feasible for automobile manufacturers to make short-term fuel-saving modifications to cars within the relevant time periods, even those posited by our colleagues.[18] Their assertion that "[t]he record is filled with contemporary evidence of the insufficiency of these lead times," Buckley Opinion at 871, thus distorts the thrust of NHTSA's report, which pointedly differentiates between "major changes" requiring long lead times and more modest fuel-saving modifications which do not require those spans.[19] Moreover, NHTSA did not conclude, as our colleagues inaccurately assert, that of the above-noted proposals, only increasing the number of four-speed transmissions "could be implemented in the relevant time frame." Id. at 872. What NHTSA stated was that "insufficient lead time" existed for manufacturers to make "sufficient enough improvements" to justify a higher CAFE standard--a different question entirely.
 
 
 73
 Petitioners do not seek the car of the future today. They ask merely that manufacturers make efforts--whether characterized as short- or long-term, as business decisions or planning decisions--to achieve those fuel savings that are feasible and practicable in line with the statutory goals. There were steps, both technological and marketing ones, that could have been taken in late 1985 and even in 1986 to improve the fuel economy of MY 1987 and MY 1988 vehicles, if the pressure of CAFE debits had been invoked. That constitutes a sufficient showing of redressability to support petitioners' suit.[20]
 
 
 74
 Our colleagues make a final backstop argument against the petitioners' standing. They suggest in one paragraph that the manufacturers could earn the necessary CAFE credits through a number of means that would not contribute to the fuel efficiency of the cars produced. Those means include "promotion campaigns to stimulate the sale of smaller cars, discontinuance of certain models, 'outsourcing' the production of others by shifting their production overseas, or limiting such energy-consuming options as air conditioning and high performance engines." Buckley Opinion at 872 (citing Intervenors' Brief on Rehearing En Banc at 15; Brief for Respondents on Rehearing En Banc at 17). Alternatively, it is suggested, manufacturers could, as a last resort, opt to pay the monetary penalties instead of redressing petitioners' injuries. Id. at 873.
 
 
 75
 Those arguments are easily put to one side. First, if auto manufacturers shift the composition of their fleets to increase the proportion of fuel-efficient vehicles or to reduce the prevalence of gas-guzzling options, petitioners' injuries will be redressed at least in part. In order for an auto manufacturer to sell more small cars to bring up its fleetwide CAFE average, it will have to take some action to make those smaller cars relatively more attractive (i.e., decrease their prices). Recent experience suggests that manufacturers engage in a variety of such marketing strategies beyond mere advertising, including offering cash rebates and below-market financing, when they deem it appropriate to promote a particular product line. Such steps, making fuel-efficient cars less expensive, necessarily make such vehicles more accessible to the fuel economy minded.
 
 
 76
 As to the outsourcing alternative suggested by our colleagues, it would affect our standing analysis only if all manufacturers were to decide either to manufacture all large vehicles abroad or not to comply with the EPCA and instead pay penalties. For if even one large manufacturer complies with NHTSA's standards in any other fashion, petitioners' injuries will have been partly redressed. Given that decisions to manufacture vehicles abroad are based on a number of factors--including foreign trade legislation, provisions in collective bargaining agreements, United States and foreign tax consequences, and foreign investment laws and risks--total collective outsourcing seems a highly unlikely scenario. Although this herd scenario is of course theoretically possible, such economic fancies are legally irrelevant in undertaking Article III standing analysis. See ILGWU, 722 F.2d at 811 (a petitioner "need not negate every conceivable impediment to effective relief no matter how speculative"). Finally, our colleagues' last-ditch scenario that manufacturers would pay the fines rather than comply with the EPCA standards is speculative in the extreme. Representatives of both Ford and GM have stated that the companies do not regard paying civil fines as a viable alternative. See supra.[21] Article III of the Constitution hardly compels us to conclude precisely the opposite.
 
 
 77
 Despite this "what if?" sequence of our colleagues, the causal connection between the EPA's award of retroactive credits (and its refusal to assign corresponding retroactive debits) and the likelihood of optimal fuel economy improvements over the next several years is at least as plausible and secure as those in many recent cases where the Supreme Court has found standing. Indeed, our colleagues brush aside too lightly explicit direction from the Supreme Court as to the limited scope for judicial speculation in standing inquiries involving complex economic and regulatory relationships:
 
 
 78
 An injunction would not, of course, guarantee that Lincoln Green would be built. MHDC would still have to secure financing, qualify for federal subsidies, and carry through with construction. But all housing developments are subject to some extent to similar uncertainties. When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy. MHDC has shown an injury to itself that is "likely to be redressed by a favorable decision." Simon v. Eastern Ky. Welfare Rights Org., supra, [426 U.S. 26] at 38 [96 S.Ct. 1917, 1924, 48 L.Ed.2d 450] [footnote omitted].
 
 
 79
 Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261-62, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977) (emphasis added).[22] And in ignoring Congress's own assessment that a credit-and-penalty scheme would modify manufacturers' behavior, our four colleagues similarly disregard a long line of Supreme Court guidance counseling against such judicial second-guessing.[23]
 
 
 80
 We turn finally to a unique problem of redressability arising not so much from the three-year limitations on credit carryforwards imposed by the EPCA as from the time it has taken this appeal to proceed. More than two-and-a-half years have elapsed since petitioners sought review of the EPA's final rule in August 1985, nearly half of this period having occurred after the initial decision of a panel of this court was handed down. In light of the principle that standing "must exist at all stages of the proceeding, and not merely when the action is initiated or during an initial appeal," Safir v. Dole, 718 F.2d 475, 481 (D.C.Cir.1983) (citing DeFunis v. Odegaard, 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974)), the question arises as to whether as of today the petitioners' injury would still likely be redressed by a favorable decision.
 
 
 81
 We conclude that petitioners' injury remains redressable. As noted previously, the three-year carryback and carryforward provisions give the EPCA an effective six-year reach into the future. If petitioners succeed in modifying the EPA's final rule, they will strip Ford and GM of credits accruing in MY 1984 and MY 1985 and thereby accentuate the deficit those companies recorded in those years. As a result, credits the manufacturers earned in MY 1987 or earn in MY 1988 will be applied retrospectively, to cure the MY 1984 and MY 1985 deficits. Credits so used will thus be unavailable to offset substandard performances in MY 1990 and MY 1991, giving the manufacturers a substantial incentive to improve their fuel efficiency in those two future years. If Ford and GM respond to that incentive, as the congressional incentive scheme clearly contemplates they will, petitioners' injury will be at least partly redressed.
 
 CONCLUSION
 
 82
 These automobile consumers have standing. The injury they suffer is a traditional economic one: higher prices and diminished availability of the goods they seek. The causal link leading to that injury from the EPA's action is unambiguous: the EPA's provision of massive credits has withdrawn a tremendous financial incentive for car manufacturers to put fuel-saving cars on the market. The redressability inquiry is equally clear: retract the credits and the incentive is restored.
 
 
 83
 Our dispute today with our colleagues opposing standing, particularly those who do so by finding no cause-and-effect relationship between the EPA's action and consumers' injury, reduces itself to one of fidelity to congressional intent. Congress designed the Energy Policy and Conservation Act as a carefully calibrated incentive system for a reason: it believed that a system of monetary penalties and incentives would be most potent in inducing automobile manufactures to make significant advances in energy conservation. The years since the passage of the EPCA have borne out the wisdom of Congress' market-oriented solution, as automobile companies, including the two implicated in this case, have consistently worked to offset or avoid paying financial penalties and in so doing have achieved impressive fuel economies.
 
 
 84
 Our determination that the petitioning organizations of automobile consumers have standing in this case respects Congress' determination that economic incentives yield results in the area of automobile fuel economy. The EPA rule challenged by petitioners would compensate manufacturers for fuel economy testing procedures that were allegedly too stringent by granting the manufacturers hundreds of millions of dollars in fuel economy credits. In concluding that petitioners have standing to challenge this rule, we merely reaffirm that the EPCA's penalty-and-credit system is substantially likely to work as Congress expected, and that the provision of hundreds of millions of dollars in fuel economy credits in this case will inevitably dampen auto manufacturers' enthusiasm for aggressively pursuing fuel economy gains.
 
 
 85
 Our four colleagues reach a different result. Blinking Congress's judgment, the experience of more than a decade under the Act, and the simple logic that economic actors respond to economic stimuli, they conclude that automobile consumers are unlikely to be harmed by the EPA's action and therefore may not have their day in court. We find nothing in Article III of the Constitution, or Supreme Court cases construing Article III to compel this result; indeed, we find in the separation of powers principles that inform Article III, see Allen, 468 U.S. at 750-52, 104 S.Ct. at a mandate to defer to the legislative facts undergirding a congressionally-designed incentive scheme. We would therefore allow petitioners to pursue their challenge.
 
 
 86
 BUCKLEY, Circuit Judge, with whom STARR and D.H. GINSBURG, Circuit Judges, join, and WILLIAMS, Circuit Judge, joins in part:
 
 
 87
 Four organizations advocating national fuel conservation policies challenge a rule of the Environmental Protection Agency. The rule increases the Agency's earlier estimates of the fuel efficiency of automobiles sold in the United States in 1980 and subsequent years by adopting new formulae for calculating fuel efficiency that favor automobile manufacturers. The petitioning organizations contend that parts of the rule violate the Energy Policy and Conservation Act of 1975. At issue are several hundred million dollars in automobile efficiency credits generated by the rule.
 
 
 88
 We granted rehearing en banc to decide whether petitioners have standing. We would hold that the petition must be dismissed for lack of subject matter jurisdiction because it does not present a case or controversy within the meaning of Article III of the Constitution.
 
 I. BACKGROUND
 
 89
 In 1973, the Organization of Petroleum Exporting Countries declared an embargo of oil exports to the United States. A sharp increase in world crude prices followed, accompanied by severe shortages of petroleum products in the United States. Congress responded in part by enacting the Energy Policy and Conservation Act ("Act" or "EPCA"). The goal of the Act is to nearly double the number of miles the average new automobile can travel per gallon of gasoline consumed, using cars sold in the United States in model year ("MY") 1974 as a base. The Environmental Protection Agency ("EPA") had calculated that those cars averaged 14 miles per gallon ("mpg"). Congress sought to achieve this goal by imposing, over a ten-year period, a series of graduated mileage requirements that would ensure "wide consumer choice" by leaving "maximum flexibility to the manufacturer" to produce a "diverse product mix." S.Rep. No. 179, 94th Cong., 1st Sess. 6 (1975).
 
 
 90
 Title III of the EPCA, codified at 15 U.S.C. Secs. 2001-2012 (1982 & Supp. II 1984), prescribes annual increases in "corporate average fuel economy" ("CAFE") standards that automobile manufacturers must achieve. For model years 1978 through 1980, the Act establishes CAFE requirements of 18, 19, and 20 mpg, respectively. 15 U.S.C. Sec. 2002(a)(1) (1982). The standards for model years 1981 through 1984 are to be established by the Secretary of Transportation, who must set them at levels that are the "maximum feasible" for each of such years, and that "will result in steady progress" towards the 27.5 mpg CAFE standard established by the Act for MY 1985. 15 U.S.C. Sec. 2002(a)(3) (1982). Among the factors the Secretary is required to consider in determining maximum feasibility are technological feasibility and economic practicality. 15 U.S.C. Sec. 2002(e) (1982).
 
 
 91
 The Act also establishes a system of penalties to enforce the mandated standards, and of credits that may be applied to reduce the penalties. The Act places the administration of these penalties and credits in the hands of the Secretary, who has delegated his duties under the Act to the National Highway Traffic Safety Administration ("NHTSA"). Each manufacturer must pay a civil penalty of five dollars for every tenth of a mile its CAFE rating falls short of the applicable fuel economy standard, multiplied by the number of cars it manufactured in the United States that year, reduced by any credits "then available under section 2002(l )." 15 U.S.C. Sec. 2008(b)(1)(B) (1982).
 
 
 92
 If a manufacturer's CAFE rating exceeds the minimum standard, the Act entitles that manufacturer to receive an appropriate credit. 15 U.S.C. Sec. 2002(l )(1)(B) (1982). Such credit "shall be available to be taken into account" for CAFE deficiencies during the three model years preceding or following the model year in which it is earned. Id. As in the case of a penalty, the amount of the credit earned in a model year is calculated by multiplying the number of cars a manufacturer produced during that year by "the number of tenths of a mile per gallon by which" the manufacturer's CAFE rating exceeds the applicable standard. 15 U.S.C. Sec. 2002(l )(1)(D) (1982).
 
 
 93
 The Act requires the Administrator of the EPA to establish "testing and calculation procedures" for determining CAFE ratings. The Administrator must follow either the procedures the EPA used to measure automobile fuel efficiency for MY 1975, or other "procedures which yield comparable results." 15 U.S.C. Sec. 2003(d)(1) (1982).
 
 
 94
 In 1979, General Motors Corporation ("GM") and Ford Motor Company ("Ford") filed petitions for rulemaking with the EPA requesting that it promulgate a CAFE "adjustment factor" for MY 1980 and beyond. They complained that changes in testing procedures adopted by the EPA since 1975 had resulted in lower CAFE ratings than they would have obtained under procedures "comparable," id., to those in effect in 1975. At the time of their request both companies faced substantial EPCA penalties.
 
 
 95
 The Administrator of the EPA denied the manufacturers' request. They then filed a petition for review in the United States Court of Appeals for the Sixth Circuit. In an unpublished opinion, our sister circuit granted review and remanded the case to the EPA with directions to promulgate appropriate procedures for establishing an adjustment factor. General Motors Corp. v. Costle, Nos. 80-3271, 80-3272 & 80-3655, mem. order (6th Cir. Jan. 26, 1982) (Joint Appendix ("J.A.") at 106); see 698 F.2d 1219 (6th Cir.1982) (report of remand).
 
 
 96
 On December 21, 1983, the EPA published a notice proposing rules that would apply an industry-wide CAFE adjustment for model years after 1979. 48 Fed.Reg. 56,526 (Dec. 21, 1983) (J.A. at 25) ("NPRM"). A supplemental notice published December 7, 1984, proposed a special industry-wide CAFE adjustment for MY 1981 to reflect the availability of fuel-efficient oils, and an adjustment for model years after 1980 to account for changes in test fuel blend. 49 Fed.Reg. 48,024 (Dec. 7, 1984) (J.A. at 36) ("Supplemental NPRM").
 
 
 97
 On July 1, 1985, the EPA promulgated a final rule prescribing CAFE adjustment equations that were made applicable to automobile CAFE ratings for model years 1980 through 1984. 50 Fed.Reg. 27,172 (1985) (amending 40 C.F.R. Part 600) (J.A. at 9). The final rule also established changes in testing procedures for the years following MY 1984. Id. at 27,173. The resulting increases in credits earned by GM and Ford enabled them to reduce the large penalties they had incurred in model years 1984 and 1985. The penalties resulted from a significant shift in consumer demand to larger, less fuel-efficient models attributable to an unanticipated drop in the price of gasoline. 51 Fed.Reg. 35,594 (1986). The new rule had a significant impact on the obligations of major manufacturers. For example, before the final rule was issued GM faced a MY 1984 penalty, net of credits carried forward, of $355.6 million. Thanks to the new rule, that penalty was reduced to $46.3 million. Reply Brief at 6.
 
 
 98
 Petitioners contend that the final rule violates the Act's provisions concerning testing procedures, 15 U.S.C. Sec. 2003(d)(3) (1982) ("Testing and calculation procedures applicable to a model year, and any amendment to such procedures ..., shall be promulgated not less than 12 months prior to the model year to which such procedures apply."). Petitioners argue, in part, that the final rule violates the 12-month requirement because it (1) adjusts CAFE ratings retroactively for model years 1980 and 1981 with respect to four changes in CAFE test procedures identified in the NPRM, and (2) adjusts CAFE ratings retroactively with respect to two test changes identified in the Supplemental NPRM. Opening Brief for Petitioners at 43.
 
 
 99
 Three petitioners, Center for Auto Safety ("CAS"), Public Citizen, and Union of Concerned Scientists ("UCS"), contend that if the court does not set aside or require modification of the final rule to meet their objections, their members will be
 
 
 100
 injured ... because [the rule] retroactively gives manufacturers credits for higher fuel economy ratings which are worth an estimated $540 million to General Motors and $245 million to Ford. These credits, which relieve manufacturers from liability for their failure to meet federal mileage standards, diminish manufacturers' incentives to develop and market a wider range of fuel-efficient vehicles sought by petitioners' members.
 
 
 101
 Id. at 4-5 (footnote omitted). Stated differently, these three petitioners maintain that (1) the challenged rule sharply reduces the large penalties manufacturers had accumulated; (2) those penalties would have forced car makers to earn new credits by achieving greater technological improvements in fuel efficiency than they would otherwise attain; and, therefore, (3) petitioners' members will lose the benefit of a wider choice among more efficient cars on the retail market.
 
 
 102
 The fourth petitioner, Environmental Policy Institute ("EPI"), alleges only that "[i]ts institutional interests in promoting conservation in this and other industries are adversely affected by EPA's decision, insofar as it diminishes incentives for conservation in this industry, which is a major user of petroleum." Id. at 5. EPI alleges no injury to its members, and fails to identify any of its specific programs that the rule will ostensibly injure.
 
 
 103
 A panel of this court unanimously held that CAS, Public Citizen, and UCS had standing to bring this action. Center for Auto Safety v. Thomas, 806 F.2d 1071 (D.C.Cir.1986). The panel based its holding on Center for Auto Safety v. National Highway Traffic Safety Admin., 793 F.2d 1322 (D.C.Cir.1986) ("CAS I "), a case arising under related circumstances. The petitioners in CAS I are the same petitioners involved here. Although CAS I concerned light trucks and this case involves passenger cars, the same provisions of the Act concerning motor vehicle fuel efficiency are at issue in both cases.
 
 
 104
 In CAS I, petitioners challenged NHTSA decisions that lowered minimum average fuel economy standards. In this case, petitioners challenge an EPA decision to raise prior estimates of manufacturers' CAFE ratings which, in turn, resulted in an increase in their credits. The principal issue before us is, in essence, whether this factual difference is of a kind that requires different conclusions as to petitioners' standing to bring these actions.
 
 
 105
 Because of the significance of the standing issues involved and the need to clarify an important area of the law, on February 6, 1987, the full court vacated the panel opinion and granted rehearing en banc. Center for Auto Safety v. Thomas, 810 F.2d 302 (1987). The court subsequently directed the parties to confine their supplemental briefs to the following question: "Does the Center for Auto Safety have standing to challenge the EPA's actions at issue in this case?" Order, No. 85-1515 (D.C.Cir. filed Feb. 24, 1987). As the panel in this case based its unanimous finding of standing on the panel majority's ruling in CAS I, our review requires that we reexamine that ruling.
 
 II. DISCUSSION
 
 106
 Article III of the Constitution limits the exercise of the "judicial Power" of the United States to "Cases" and "Controversies." The Supreme Court has defined the essential elements of a case or controversy as follows:
 
 
 107
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."
 
 
 108
 Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). As we noted recently in Haitian Refugee Center v. Gracey, 809 F.2d 794, 799 (D.C.Cir.1987), the first of these three elements "is an injury of the sort which the law will recognize. The other two are stated as varieties of causation: that the injury was not only caused by the action challenged but can be alleviated by that action's cessation."
 
 
 109
 In the discussion that follows we first examine petitioners' claim of injury and then address causation and redressability.
 
 A. Injury
 
 110
 The first requirement of Article III standing is that petitioners convincingly allege personal, concrete injury. Following applicable Supreme Court precedents, we reject EPI's standing for failure to allege adequate injury. On the other hand, we find the other petitioners have alleged injury that is sufficiently personal and concrete to meet the first part of the Article III standing test.
 
 1. EPI's Alleged Injury
 
 111
 Petitioner EPI asserts merely that the EPA rule conflicts with its organizational purpose of advocating a national policy favoring fuel conservation. We think this claim is constitutionally insufficient. The Supreme Court has held that organizations can sue on their own behalf if they establish "concrete and demonstrable injury to the organization's activities." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). We have since stated that such organizational standing depends on the organization's "programmatic concerns," and not on its abstract concerns about the achievement of certain national policy goals. Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 937 (D.C.Cir.1986). In CAS I, the panel unanimously agreed that EPI had failed to allege injury of the type Article III requires. See 793 F.2d at 1328-29 n. 41; id. at 1342 n. 1 (Scalia, J., dissenting).
 
 
 112
 EPI's allegation of injury in this case is the same one it made in CAS I. Rather than allege specific, concrete injury to any of its organizational programs or projects, EPI asserts that as a result of the EPA's rule, "[i]ts institutional interests in promoting conservation in this and other industries are adversely affected." Opening Brief for Petitioners at 5. Standing, however, requires a more tangible claim than this. As the Supreme Court noted in Valley Forge, the Constitution "does not provide a special license to roam the country in search of governmental wrongdoing.... The federal courts were simply not constituted as ombudsmen of the general welfare." 454 U.S. at 487, 102 S.Ct. at 766-67 (footnote omitted).
 
 
 113
 In sum, EPI's complaint has no place in an Article III court. Nevertheless, as the remaining petitioners have alleged a sufficient type of injury, we do not dismiss the case on this basis.
 
 2. The Remaining Petitioners
 
 114
 CAS, Public Citizen, and UCS invoke the "associational standing" rule of Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977) (construing Warth v. Seldin, 422 U.S. 490, 511, 515, 95 S.Ct. 2197, 2211, 2213, 45 L.Ed.2d 343 (1975)). In Hunt, the Court held that an agency of the State of Washington representing the interests of apple growers could bring suit on their behalf, as if it were "a voluntary membership organization--a typical trade association," 432 U.S. at 342, 97 S.Ct. at 2441, to challenge a North Carolina statute burdening the Washington growers' trade. In reaching its holding, Hunt applied the following three-part requirement for associational standing distilled from Warth:
 
 
 115
 Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 116
 Id. at 343, 97 S.Ct. at 2441.
 
 
 117
 Under the Hunt rule, the main issue before us is whether petitioners' members satisfy all parts of the Article III standing requirement. We must apply each part of the standing test separately. On the injury issue, we find this case similar to CAS I. There, the same petitioners attacked a NHTSA rule reducing minimum CAFE levels for light trucks in model years 1985 and 1986. Petitioners' main allegation was that the challenged rules "violated EPCA's requirement that the agency designate standards at 'the maximum feasible [CAFE] level.' " CAS I, 793 F.2d at 1323 (quoting 15 U.S.C. Sec. 2002(b) (1982)). The court held, at the threshold, that
 
 
 118
 petitioners plainly have standing to bring this action in a representative capacity for members of their organizations. Their members have suffered injury-in-fact because the vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding.
 
 
 119
 Id. at 1324.
 
 
 120
 After carefully reconsidering CAS I, we agree with the panel's holding that CAS, Public Citizen, and UCS have alleged a constitutionally cognizable type of injury because their members can establish a sufficiently personal and concrete interest in the future availability of vehicles having a greater fuel efficiency than those GM and Ford would otherwise produce. Petitioners state their injury as a reduction in the "range of fuel-efficient vehicles" sought by their members. Opening Brief for Petitioners at 5. While not clearly defined, petitioners' complaint appears to be that as a result of the EPA order, GM and Ford will fail to develop and utilize technologies that would improve the fuel efficiency of their vehicles. Thus, the injury derives from the failure of the manufacturers to enhance the fuel economy of the individual models they market, not from their failure to meet fleet-wide fuel economy standards.
 
 
 121
 We emphasize, however, that we do not decide whether petitioners have demonstrated adequately that this injury is likely to occur, i.e., is sufficiently real and immediate, not conjectural or hypothetical. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). We need not determine the likelihood that auto makers will produce a smaller variety of fuel-efficient cars because we conclude that even if this injury is sufficiently real and immediate, it is not likely that it will be caused by the challenged action, or be redressed by a favorable decision.
 
 
 122
 We reject the other theories of injury to members advanced by petitioners, and we do not interpret CAS I to have approved them. For example, petitioners assert that they represent the consuming public at large, and allege that if the EPA's rule is allowed to stand, the public will not receive the benefits in terms of energy conservation intended by the EPCA. They allege that
 
 
 123
 [w]hen NHTSA impermissibly lowers a CAFE standard, or when EPA allows auto makers to overstate the fuel economy of their fleet in violation of the "comparability" requirement in 15 U.S.C. Sec. 2003(d)(1), consumers are injured because automobiles save less energy and use more gasoline than Congress intended.
 
 
 124
 Supplemental Brief for Petitioners at 7. These allegations are constitutionally insufficient.
 
 
 125
 The fact that Congress has determined that consumers would be injured by driving automobiles that use more rather than less fuel is of little help in determining whether these petitioners are able to establish, on behalf of their members, injuries-in-fact sufficiently personal and concrete to meet the requirements for Article III standing. Even if the EPA's rule results in greater energy use than Congress intended, an agency's failure to "act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984).
 
 
 126
 Petitioners disagree, asserting that "the injuries here are at least as concrete as those recognized in cases such as United States v. Students Challenging Regulatory Agency Practices [sic], 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ["SCRAP"] ...; Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ...; and Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)...." Supplemental Brief for Petitioners at 8. These authorities do not support the broad proposition for which they are cited, viz., that the increased use of gasoline by American consumers as a whole constitutes an injury-in-fact to these petitioners' members.
 
 
 127
 The plaintiffs in SCRAP were able to satisfy the Court that the challenged order would adversely affect recreational resources actively used by their members in the Washington, D.C. area. 412 U.S. at 685, 93 S.Ct. at 2415. Unlike the SCRAP plaintiffs, these petitioners' members have alleged no specific injury uniquely suffered apart from the interest shared by all in reducing our nation's fuel consumption. Thus, they resemble more closely the plaintiffs in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), than the SCRAP plaintiffs. Indeed, SCRAP specifically distinguished Sierra Club on this basis. 412 U.S. at 687, 93 S.Ct. at 2416 ("No such specific injury was alleged in Sierra Club.").
 
 
 128
 Similarly, the plaintiffs in Duke Power included "40 individuals who live within a close proximity to the planned [nuclear power] facilities." 438 U.S. at 67, 98 S.Ct. at 2416. The Court accepted only two of the district court's extensive findings with respect to injury: "the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants.... [a]nd the emission of non-natural radiation into appellees' environment...." 438 U.S. at 73-74, 98 S.Ct. at 2630-31 (emphasis added). Duke Power clearly involved a more immediate and direct injury than the generalized interest in energy conservation asserted by these petitioners.
 
 
 129
 Finally, petitioners cite American Cetacean for the proposition that "denial of [an] opportunity to watch whales" is sufficient to establish Article III standing. Supplemental Brief for Petitioners at 8. There, the Court indicated that the adverse effect of the challenged action on the whale watching and studying of the plaintiff organizations' members was a sufficient injury-in-fact. American Cetacean did not hold that any member of the public who desired that Congress' policy of whale conservation be carried out could bring suit in federal court. Rather, as the Court's citation to Sierra Club and SCRAP makes clear, petitioners' standing was established by the impact of the challenged actions on the use of specific natural resources by specific members.
 
 
 130
 At oral argument, petitioners made the further claim that increased gasoline consumption by the nation as a whole will increase the gasoline prices that their members pay. Petitioners have failed to demonstrate adequately that the injury will materialize. First, petitioners failed to show that the increases in credits will increase fuel consumption. We cannot assume this will occur. For example, even if Ford and GM choose to increase their CAFE ratings in model years 1986 through 1988 through such measures as discontinuing their less fuel efficient models (cf. infra at 872), there is no reason to conclude that Americans will respond by consuming less gasoline. Consumers accustomed to buying Cadillacs or Lincolns might decide to keep older cars or shift to foreign cars that consume more gas. Moreover, those who purchase more fuel efficient cars might choose to drive more. Clearly, the effect of the credits on fuel consumption in a particular year is simply speculative.
 
 
 131
 Similarly, there is no evidence that any increase in demand that might be attributed to the automobiles produced by GM and Ford in the United States will have a measurable impact on gasoline prices. Petroleum prices are determined by global supply and demand. Any increase in demand traceable to the less efficient fleets produced by these two manufacturers would represent so trifling a percentage of the global market that the price at the pump is unlikely to be affected. Cf. Metcalf v. National Petroleum Council, 553 F.2d 176, 186 (D.C.Cir.1977) (appellants failed to specify monetary loss resulting from domination of National Petroleum Council; "[t]he injury needed for standing does not have to be substantial, but it must be at least identifiable...." (emphasis in original)).
 
 
 132
 Petitioners have the burden of demonstrating a "distinct and palpable injury," Warth, 422 U.S. at 501, 95 S.Ct. at 2206, and these allegations do not suffice. As illustrated by cases such as Allen, 468 U.S. at 758, 104 S.Ct. at 3328, and Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), standing cannot be established by merely inferring how removing the economic incentive of the particular action being challenged will affect diversely situated parties not before the court. Too many uncertainties inhere in petitioners' assertion that fuel prices will increase for us to accept it without any supporting evidence.
 
 
 133
 We also reject the suggestion, in Chief Judge Wald's companion opinion ("Wald Opinion"), of injury to secondary purchasers. Wald Opinion at 850 n. 10. The possible impact on used car fuel efficiency noted by our colleagues is, of course, derivative of the fuel efficiency of cars produced for the primary market. Our colleagues' assertion of a "disinformation injury" resulting from incorrect CAFE ratings for second-hand cars is nowhere alleged. Petitioners have not suggested that their members are interested in used cars, much less in the proper CAFE ratings of those cars. Nor have they suggested that the revised CAFE ratings will be disseminated to prospective used car purchasers.
 
 
 134
 We therefore recognize as a sufficient type of injury only the claim that members of CAS, Public Citizen, and UCS will lose the opportunity to purchase the more fuel-efficient cars they claim GM and Ford would have produced but for the EPA's action.
 
 B. Causation and Redressability
 
 135
 After parsing petitioners' allegations of injury and finding one that is personal and concrete, our task is to determine whether that single cognizable injury is fairly traceable to the challenged EPA rule, and thus likely to be redressed by setting aside the rule. See Bender v. Williamsport Area School Dist., 475 U.S. 534, 542, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (quoting Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758); Allen, 468 U.S. at 751, 104 S.Ct. at 3324; See generally id. at 753 n. 19, 104 S.Ct. at 3325 n. 19 (referring to distinction, inapplicable here, between the "fairly traceable" and "redressability" components of Article III standing test).
 
 
 136
 To establish causation and redressability, petitioners must allege facts "from which it reasonably could be inferred that, absent" the EPA's July 1, 1985 final rule, "there is a substantial probability that" in practical effect the credit provisions would have induced GM and Ford to eliminate or reduce their MY 1984 and MY 1985 penalties by producing cars having a greater fuel efficiency than those they otherwise would have marketed. See Warth, 422 U.S. at 504, 95 S.Ct. at 2208. As fuel efficiency is the product of technology, only if the credit provision will induce GM and Ford to use more advanced technologies in their production models will the remedy sought by petitioners be likely to redress their members' injury.
 
 
 137
 In CAS I, the court held that the alleged injury of the members of CAS, Public Citizen, and UCS was fairly traceable to the challenged NHTSA decisions to lower fuel efficiency standards, and likely to be redressed by setting the NHTSA decisions aside. 793 F.2d at 1334-35. The elements upon which CAS I based its finding of traceability and redressability, however, are lacking here.
 
 
 138
 The distinction results directly from the difference between the Act's credit provisions at issue here, and the provisions regarding minimum fuel efficiency standards that were involved in CAS I. For purposes of analyzing causation and likelihood of redress, the Act's credit mechanism cannot be equated with the setting of standards; while the annual raising of efficiency standards can reasonably be expected to force technological change, the Act's credit provisions cannot.
 
 
 139
 The EPCA was enacted to force major improvements in the average fuel efficiency of passenger cars by mandating a series of increasingly stringent fuel efficiency standards. Congress hoped in this way to increase the CAFE ratings of automobiles sold in the United States from approximately 14 mpg in MY 1974 to 27.5 mpg in MY 1985. As the Senate Commerce Committee noted, "[t]he establishment of fuel economy standards for the next 10 years creates the necessary climate for investment in automotive technology leading to substantial energy conservation." S.Rep. No. 179, 94th Cong., 1st Sess. 9 (1975). The experience of a decade leaves little doubt that the congressional scheme in fact induced manufacturers to achieve major technological breakthroughs as they advanced towards the mandated goal.
 
 
 140
 Because the cognizable injury in these cases, as in CAS I, is limited to the interest of petitioners' members in the timely "development of new technologies that would make even greater fuel savings possible in the future," CAS I, 793 F.2d at 1332, it is necessary to determine whether the credit provision of the Act can be expected to have a comparable impact on the rate of technological innovation. Our inquiry thus narrows to determining whether the credit provision, as it interacts with a previously assessed penalty, will operate as an alternative method of forcing technology.
 
 
 141
 Congress was fully aware that the achievement of its long-term goal would require a massive, sustained mobilization of research and development resources extending over a decade or more. The key to the effort was the establishment of standards against which car makers could work and plan over a period of years. The industry responded by launching a broad range of research and development programs covering such diverse fields as the development of lighter materials, reductions in aerodynamic drag, and improvements in transmission and engine design.
 
 
 142
 In sharp contrast, a company cannot be expected to mount a comparable research and development effort as a short-term response to an unanticipated penalty. It is not credible that a manufacturer will attempt, let alone achieve, the necessary advances in time to incorporate them in its third year's production. The more likely expectation is that a company faced with substantial penalties will first review the available alternatives, including payment of the penalties and changes in model mix, and then pursue the least costly of them.
 
 
 143
 In the case at hand, GM and Ford had significantly less than three years within which to begin marketing cars that could establish the CAFE ratings required to offset MY 1984 and 1985 penalties. At the time the final order issued, on July 1, 1985, the companies had less than eighteen months to incorporate improvements in the designs of the cars they would be producing in MY 1987, and Ford had less than thirty within which to redesign its MY 1988 models.
 
 
 144
 The record is filled with contemporary evidence of the insufficiency of these lead times. In another proceeding, for example, NHTSA noted that
 
 
 145
 once a new design is established and tested as feasible for production, the leadtime necessary to design, tool, and test components such as new body sheetmetal subsystems for mass production is typically 22 to 29 months. Other potential major changes often take longer. Leadtimes for new vehicles are typically at least three years.
 
 
 146
 51 Fed.Reg. 35,603 (1986). In that same proceeding, Chrysler submitted a comment stating that " 'the leadtime required to implement these improvements in engines, transmissions, aerodynamics and rolling resistance, is usually three to four years.' " Id. at 35,610. Thus, at least three years will ordinarily elapse between the time a car maker decides to pursue specific improvements and the time they first become available to the public--in cars produced during the fourth model year following the initial decision to develop them.
 
 
 147
 Our colleagues suggest that the proper frame of reference is six years, not three. Wald Opinion at 30-31. If the challenged rule is invalidated, our colleagues argue, the manufacturers will have to carry back credits from MY 1987 and 1988 to offset the MY 1984 and 1985 penalties. The auto makers will now be able to carry forward the MY 1987 and 1988 credits to MY 1990 and 1991, reducing their incentive to meet or exceed CAFE ratings in these years.
 
 
 148
 This scenario, however, is unsupported by the record. It assumes that the manufacturers would have significant credits in MY 1987 and 1988 that they could carry back or forward. By July 1985, when the challenged order issued, it was clear that Ford and GM would fail to meet the MY 1987 and 1988 CAFE standards. On March 1, 1985, three months before the EPA adopted the rule here challenged, the two companies petitioned for a reduction in the 27.5 mpg CAFE standards established for those years. EPA Docket Nos. FE-85-01-N01-001 and -003, final rule promulgated at 51 Fed.Reg. 35,594 (1986). While the manufacturers' statements are no doubt self-serving, the petitions strongly suggest that Ford and GM were unlikely to exceed the 27.5 mpg CAFE standards for MY 1987 and 1988. NHTSA agreed that these manufacturers could not meet the 27.5 mpg standard without significantly reducing consumer choice and shifting production overseas, so it reduced the MY 1987 and 1988 CAFE standards to 26.0 mpg, barely below the level it projected the manufacturers were likely to meet.
 
 
 149
 When the final order here under review issued, no one could reasonably have thought that Ford and GM enjoyed the prospect of significant MY 1987 and 1988 credits to carry forward or back. Any small credits that they might earn they likely would carry back even if the challenged order were implemented, reducing (but not eliminating) their remaining MY 1984 and 1985 penalties. An auto maker is more likely to reduce an existing penalty than save credits to offset possible future penalties. Whatever credits the manufacturers might have to carry forward to MY 1990 and 1991 would be so insignificant with or without the challenged order that they would be unlikely to change long-term design plans.
 
 
 150
 We conclude, therefore, that three years is the relevant period, and that as of the date petitioners brought their action, too little time remained for GM and Ford to earn credits through further technological improvements. We therefore consider irrelevant, for purposes of our standing analysis, intervenors' argument that such improvements between the date of our judgment herein and the expiration of the credit carry forward would be impossible. If insufficient time remains to redress the injury as of the latter date, petitioners' case may be moot, but that does not mean they were without standing to bring the action in the first instance. "[T]he standing inquiry looks to the nature of the injury to the recipient, while mootness turns on whether an injury, already determined to be of the type amenable to judicial action, still exists...." International Union of Bricklayers v. Meese, 761 F.2d 798, 805 (D.C.Cir.1985) (footnote omitted). See also CAS I, 793 F.2d at 1334.
 
 
 151
 Given the industry's lead times, we also find it unlikely that a reversal of the July 1, 1985 rule would cause the manufacturers (as petitioners suggest) to redesign their MY 1987 and 1988 cars to incorporate tested technologies in a broader range of vehicles. Supplemental Brief for Petitioners at 11. The facts alleged do not permit the reasonable inference that this would be the substantially probable result. Warth, 422 U.S. at 504, 95 S.Ct. at 2208. See also Linda R.S. v. Richard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) ("The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative."). In fact, the record suggests that design changes are highly unlikely. As noted supra at 871, GM and Ford petitioned NHTSA for a reduction in MY 1987 and 1988 CAFE standards before the order here challenged was finally promulgated. NHTSA granted the petition, concluding that significant design changes were not feasible within the relevant time frame.
 
 
 152
 GM and Ford acknowledged that they could earn credits through a number of other means, e.g., promotion campaigns to stimulate the sale of smaller cars, discontinuance of certain models, "outsourcing" the production of others by shifting their production overseas, or limiting such energy-consuming options as air conditioning and high performance engines. Supplemental Brief for Intervenors at 15; Supplemental Brief for Respondents at 17. While these alternatives would decrease the manufacturers' CAFE ratings (by reducing the fuel consumption of the fleet), they would not result in the improvements in fuel efficiency design that petitioners desire.
 
 
 153
 Our colleagues doubt that these alternatives would be utilized, characterizing our reference to them as a "back-stop argument." Wald Opinion at 860. Our colleagues' skepticism, however, should be tempered by the careful judgment of the agency responsible for enforcing the EPCA. In considering the manufacturers' petition to reduce MY 1987 and 1988 CAFE standards, NHTSA examined the auto makers' alternatives. The agency concluded that "it is too late to initiate further major technological improvements...." 51 Fed.Reg. 35,603 (1986). In NHTSA's view, the manufacturers were more likely to restrict domestic production of larger cars and high performance engines and shift their production overseas. Id. at 35,604.
 
 
 154
 Our colleagues nevertheless argue that GM and Ford could make modest short-term design changes within the time available. These changes include installation of a higher number of four-speed transmissions in midsize models, material substitution, decreased aerodynamic drag coefficients, and increased use of front-wheel drive. Wald Opinion at 859, quoting 51 Fed.Reg. 35,607 and 35,611. Our colleagues fail to note, however, that NHTSA concluded that only the first of these proposals could be implemented by GM in the relevant time frame. See 51 Fed.Reg. 35,606 (no "additional technological actions that Ford could take within the available lead time to improve its CAFE level"); id. at 35,605 (only additional technological action "GM could take to improve its CAFE [ratings] within the available leadtime would be to increase the installation rates of 4-speed automatic transmissions" (emphasis added)). Increasing the number of four-speed transmissions in certain midsize models, moreover, does not increase the variety of fuel efficient models from which petitioners' members can choose. With or without the increased credits, consumers can buy midsize GM cars with four-speed transmissions.
 
 
 155
 Our colleagues suppose that auto makers that choose to decrease CAFE ratings by increasing the proportion of fuel-efficient cars sold will decrease their prices. Wald Opinion at 860. This prediction is speculative; there is no reason to think that the manufacturers will not simply decrease production of large cars. More importantly, making fuel-efficient cars more affordable will not redress petitioners' members' injury: "diminish[ing] manufacturers' incentives to develop and market a wider range of fuel-efficient vehicles...." Brief for Petitioners at 5.
 
 
 156
 Finally, the two companies have the further option of paying fines, which could well prove the least costly of the available alternatives. Petitioners discount this possibility, citing statements submitted by GM and Ford to NHTSA on August 8, 1985, in connection with its review of the MY 1987/88 standards: "GM does not consider the payment of civil penalties to be a reasonable alternative when determining our long-term planning strategies"; "Ford, along with others, have [sic] said many times that the 'unlawful conduct' provision of EPCA precludes planning to pay fines as an alternative to CAFE compliance." Appendix to Reply Brief.
 
 
 157
 These statements, however, are irrelevant to the case at hand. The question is not whether GM and Ford would deliberately elect to break the law and pay the resulting penalties rather than incur the higher cost of meeting the mandated standards. Here, the two companies have found themselves in violation of the CAFE standards because of circumstances NHTSA acknowledges to have been unanticipated and beyond their control. 51 Fed.Reg. 35,594 (1986).
 
 
 158
 The fact that manufacturers, in their forward planning, do not consider fines to be an acceptable alternative to compliance with the law does not mean that they will redesign their fleets and retool their factories to avoid payment of penalties inadvertently incurred in a particular model year. Increasingly stringent CAFE standards established years in advance provide the automobile industry with both the incentives and the time to mobilize formidable engineering and financial resources. On the other hand, a manufacturer faced with an unanticipated penalty for a particular model year must make a short-term business decision, not a long-range planning decision. Its likely response will be to choose the least costly short-term alternative for addressing the penalty. Thus, there is no basis for concluding that the probable effect of a penalty will be to force a manufacturer to enhance the fuel efficiency of cars produced within the three-year term of the Act's credit carry back provision.
 
 
 159
 The insufficiency of petitioners' causation and redressability showing is demonstrated vividly by Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). There, indigents and organizations representing indigents challenged an IRS ruling that relaxed the requirement that hospitals serve persons unable to pay in order to qualify as charitable organizations. Plaintiffs alleged that the IRS's action "had 'encouraged' hospitals to deny services to indigents." 426 U.S. at 42, 96 S.Ct. at 1926. The trial court granted the defendants' motion to dismiss for lack of standing, and the Supreme Court affirmed. Although plaintiffs had alleged adequate injury (denial of hospital services), they had failed satisfactorily to allege causation:
 
 
 160
 It is purely speculative whether the denials of service specified in the complaint fairly can be traced to [defendants'] "encouragement" or instead result from decisions made by hospitals without regard to the tax implications.
 
 
 161
 Id. at 42-43, 96 S.Ct. at 1926. Redressability was equally speculative:
 
 
 162
 So far as the complaint sheds light, it is just as plausible that the hospitals to which [plaintiffs] may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services.
 
 
 163
 Id. at 43, 96 S.Ct. at 1926 (emphasis added). Plaintiffs' allegations were insufficient to establish a "substantial likelihood" of redressability. Id. at 45, 96 S.Ct. at 1928. See also Allen, 468 U.S. at 758-59, 104 S.Ct. at 3328 (parents of black children lack standing to challenge IRS procedures concerning denial of tax exemptions to racially discriminatory private schools, as the response of school administrators and the parents of children attending such schools was uncertain).
 
 
 164
 If the plaintiffs in Simon had prevailed, the hospitals would have faced two options: increasing service to the poor, or forgoing the tax benefits. According to the Court, the likelihood that a given hospital would choose one course or the other was roughly equal. Here, the auto makers would have more than two options in response to a reversal of the agency's action. They could change their marketing, outsource production, pay fines, or modify design. The manufacturers are less likely to modify design than the hospitals were likely to increase service to the poor. Far from being "just as plausible," 426 U.S. at 43, 96 S.Ct. at 1926, a change in design seems the least likely of the auto makers' options. Petitioners have failed to satisfy their burden of demonstrating a substantial likelihood of redressability.
 
 
 165
 Petitioners argue that causation and redressability are conclusively established by Congress' belief that the credit and penalty system would force technological change. We disagree with both the premise and the conclusion. First, petitioners' standing is not decisively determined by a congressional assessment of probable cause and effect:
 
 
 166
 Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself" that is likely to be redressed if the requested relief is granted.
 
 
 167
 Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (citations omitted). Although Congress' understanding might affect the quantum of proof that the petitioner must provide, the ultimate decision must be made by the courts. Otherwise, Congress could abrogate the Art. III minima simply by making "findings" concerning causation and redressability. Cf. In re: Sealed Case, 838 F.2d 476, 487 n. 20 (D.C.Cir.) ("we do not believe we can treat Congress' constitutional interpretation as we would an agency's construction of its governing legislation"), probable jurisdiction noted sub nom. Morrison v. Olson, --- U.S. ----, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988). We previously have examined legislative findings bearing on redressability, but only after we have determined independently that the record demonstrated a substantial likelihood of redress. See, e.g., National Wildlife Fed'n v. Hodel, 839 F.2d 694, 708-09 (D.C.Cir.1988) (Congress' admonition supports inference of causation), and cases cited in Wald Opinion at 856. We are aware of no case premising a finding of redressability on congressional intent alone--much less a case relying on congressional findings contradicted by the record evidence.
 
 
 168
 Second, what legislative history there is indicates that Congress did not intend the credit carry back/carry forward provisions to operate in the manner petitioners suggest. Under the EPCA as originally enacted, a credit could only be applied against a civil penalty incurred in the model year immediately preceding or succeeding the year in which the credit was earned. S.Conf.Rep. No. 516, 94th Cong., 2d Sess. 159 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1762, 2000. Neither the Conference Report nor either of the reports accompanying the Senate and House versions of the Act provide any indication of the rationale for the creation of these credits. What can be asserted with some assurance, however, is that the carry back provision was not intended as a technology-forcing mechanism. A manufacturer would not know the amount of the penalties incurred in a given model year until production of the next year's cars was already under way. Congress was fully aware of the long lead times required in the automotive industry to incorporate innovations of any kind into new production models. Congress could not have meant the single-year carry back/carry forward provision to change the inherently long-term plans of the automotive industry with respect to design.
 
 
 169
 The carry back/carry forward periods were extended from one to three years by the Automobile Fuel Efficiency Act of 1980, Pub.L. No. 96-425, Sec. 6(b), 94 Stat. 1821, 1826. This change was made in response to a recommendation of the Department of Transportation which read, in part, as follows:
 
 
 170
 DOT recommends that credits be allowed to be carried forward (or backward) for three years to enable manufacturers to benefit from their early conservation efforts and better balance future planning.
 
 
 171
 H.Rep. No. 1026, 96th Cong., 2d Sess. 11 (1980), U.S.Code Cong. & Admin.News 1980, p. 3849 (emphasis added). In explaining the purpose of the bill he introduced to implement the DOT recommendation, Congressman Philip R. Sharp stated:
 
 
 172
 [I]t will help manufacturers meet changing market demands without weakening conservation efforts.... It would provide an adjustment period in the event of a severe economic crunch or if one of the technologies the industry is counting on does not come through or is banned for some other reason. It is a change that can be made without disturbing the goals Congress set forth which are so critical to our long-term future.
 
 
 173
 Id. at 18, U.S.Code Cong. & Admin.News 1980, p. 3857.
 
 
 174
 In its Report, the Committee "stresse[d] that the objective of the proposal is to improve flexibility, provide better planning and encourage the manufacturers to exceed the standards." Id. at 19, U.S.Code Cong. & Admin.News 1980, p. 3858. It explained that
 
 
 175
 these changes will act as an incentive to manufacturers to exceed the standards now set whenever they can in order to build up credits to act as safeguards against shortfalls that might occur in the future.
 
 
 176
 Id. at 20, U.S.Code Cong. & Admin.News 1980, p. 3858 (emphasis added). While this language reflects an awareness that a longer carry forward period would encourage car makers to provide consumers with the benefit of breakthroughs as soon as achieved, we have been unable to discern in the House Report, or elsewhere in the legislative history, any findings to suggest that Congress expected the availability of the longer carry backs to serve a technology-forcing function. We believe it far more likely, as the statement of Congressman Sharp suggests, that the extension of the credit carry forward/carry back provisions was motivated by considerations of fairness and the need for flexibility. Aware of the uncertainties inherent in developing ever more sophisticated technologies, Congress sought to assure auto makers that they would not be penalized for failure to meet precise timetables so long as they achieved the mandated standards on approximate schedule. Thus relieved of the burden of rigid deadlines, manufacturers would be able to realize the optimum results from their research and development efforts.
 
 
 177
 In sum, even though we do not believe the legislative history would be controlling on the question of standing, we find nothing in the congressional reports and record that is inconsistent with our finding that petitioners have failed to establish a substantial likelihood of redressability.
 
 III. CONCLUSION
 To recapitulate:
 
 178
 (1) Petitioners' only cognizable injury is the claim by CAS, Public Citizen, and UCS that the EPA's action will "diminish manufacturers' incentives to develop and market a wider range of fuel-efficient vehicles sought by [their] members."
 
 
 179
 (2) Redressability is to be measured solely in terms of the likely effect of the desired court order on product design as opposed to product mix.
 
 
 180
 (3) While common sense suggests that an auto maker's behavior will be influenced by its ability to offset penalties by earning credits, common sense also suggests that a manufacturer will pursue the least costly of the available options for earning credits. As the timely improvement in product fuel efficiency is likely to be the least available as well as the most costly of the options open to a manufacturer, it is the least likely to be exercised.
 
 
 181
 (4) The record does not support petitioners' contention that were the EPA order to be reversed, GM and Ford would find earning credits through timely improvements in product design to be feasible, let alone the option of choice.
 
 
 182
 Accordingly, we would conclude that members of CAS, Public Citizen, and UCS could not have brought this suit in their own behalf because their allegation of cognizable injury would not be fairly traceable to the EPA's final rule, and an order modifying or setting aside that rule would not redress their alleged injury. As petitioners CAS, Public Citizen, and UCS fail the first requirement for associational standing established in Hunt, and as EPI also lacks standing, the court should dismiss the petition for review. Because we believe the court lacks subject matter jurisdiction, we need not decide whether petitioners lack standing under prudential principles.
 
 SILBERMAN, Circuit Judge:
 
 183
 I agree with Judge Buckley's opinion that petitioners lack standing, but I base my conclusion on reasoning similar to that employed in Judge (now Justice) Scalia's dissent in Center for Auto Safety v. NHTSA, 793 F.2d 1322 (D.C.Cir.1986) ("CAS I "). Accordingly, I would disavow the panel opinion in that case.
 
 I.
 
 184
 This is a remarkable case, for the injury petitioners[1] have asserted stretches beyond recognition the limits the Supreme Court has articulated for the types of harm sufficient to confer Article III standing. As Judge Scalia summarized in his dissent in CAS I, 793 F.2d at 1342-43, the Supreme Court has required that "[t]o satisfy Article III standing requirements ... the asserted injury must be 'distinct and palpable,' Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), 'particular [and] concrete,' United States v. Richardson, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974), and 'specific [and] objective,' Laird v. Tatum, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), rather than 'conjectural [or] hypothetical,' City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983), 'remote [and] unsubstantiated by allegations of fact,' Warth v. Seldin, 422 U.S. at 507, 95 S.Ct. at 2209, 'speculative,' Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 42-46, 96 S.Ct. 1917, 1926-28, 48 L.Ed.2d 450 (1976), or 'abstract,' O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)." To demonstrate how far short of this standard petitioners' asserted injury falls, we should consider what a hypothetical affidavit from a member of petitioners' organization supporting the claim of injury would look like. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977) (organization's standing as representative of members depends on a concrete injury to one or more of those members); see also National Wildlife Fed'n v. Hodel, 839 F.2d 694, 703 (D.C.Cir.1988) (describing remand to district court to require plaintiff association to produce affidavits of members showing specific injury). The alleged injury is said to result from the failure of automobile manufacturers "to develop and market a wider range of fuel-efficient vehicles." Petitioners' Brief at 5 (emphasis added).[2] The primary impact of EPA's contested action apparently falls on Ford and General Motors[3] so, more precisely stated, petitioners' injury results from the failure of Ford or General Motors to develop and market a wider range of fuel-efficient cars. And petitioners do not contend that the automobile market is so uncompetitive that because Ford and General Motors fail to develop and market the wider range of the cars they desire, no automobile manufacturer will do so. (Considering that the United States, the largest single national market for the sale of automobiles, is virtually awash with a great variety of foreign and domestic models, such a contention would be difficult to sustain.) Nor is any claim made that EPA's actions somehow preclude competition in variety and price at the level of fuel efficiency petitioners desire (whatever that may be). The cars petitioners want may therefore very well be available, but not manufactured by Ford or General Motors.
 
 
 185
 It is not an easy task to describe the model or models that petitioners' members want, for petitioners have failed to identify any particular model, component, or performance standard their members seek but cannot find. See CAS I, 793 F.2d at 1343-44 (Scalia, J., dissenting). Petitioners do not allege, for example, that their members desire to purchase a station wagon that achieves over 33 miles per gallon, or a subcompact that gets 45 miles a gallon, or a car with a more efficient automatic transmission. In fact, petitioners' members do not appear to be concerned about the absence of a particular model of car, or a number of particular models of cars, from the Ford or General Motors lines. For petitioners claim to be injured because of Ford's and GM's failure to develop a "wider range of fuel-efficient vehicles." Obviously, the average customer does not purchase a range of cars, and there is no showing that any car rental companies, for example--which might be interested in purchasing a range of cars--are members of petitioners' organizations. Petitioners thus are not claiming injury because they are unable to buy a particular car; they are claiming injury because they are unable to choose among as many "fuel-efficient" models as they would like. And since petitioners give no content to "wider range" or "fuel-efficient," those rather subjective terms must find their meaning in relation to existing variety and standards of fuel efficiency. In other words, petitioners are alleging that their members are injured because when they go to the car lot to purchase a Ford or a GM, they have only, say, fifteen models of relative high fuel efficiency from which to choose, as opposed to twenty. We do not know the exact or approximate numbers at issue here, for petitioners only speak in terms of "wider"; it could be, therefore, that one more model would cure their injury, or perhaps it would take a hundred more models.
 
 
 186
 Judged according to petitioners' claimed injury, a hypothetical affidavit by one of their injured members would read as follows: "I would like to purchase a Ford or General Motors automobile. When I make my purchase, I would like to be able to choose among X number of models with certain unspecified and perhaps currently unavailable and even unthought of fuel-efficient characteristics. At the present time, my choice of Ford or General Motors cars is limited to X minus Y number of models. This injures me."
 
 
 187
 I think such an affidavit would patently fail, on a number of grounds, to articulate an injury sufficient to confer jurisdiction upon an Article III court. So long as consumers have available virtually interchangeable products, a reduction in supply--indeed even the actual cessation--of one brand cannot constitute an Article III injury. Otherwise, we will have opened the federal courts for any devotee of a particular product to sue a manufacturer directly because of a decision to stop producing that product. I see no reason, under the injury theory advanced by petitioners, why a consumer attached to, let us say, a brand of tissue paper could not sue to block a merger that would result in its discontinuance. But such a theory involves nothing more than an effort to use the courts to shape the world in accordance with petitioners' wishes, see Diamond v. Charles, 476 U.S. 54, 65, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1986), and thus is inconsistent with Article III.
 
 
 188
 Chief Judge Wald, presumably in order to avoid these consequences of her expansive theory of injury, imports, without any authority at all, a "state action" limitation. See Wald op. at 852 n. 12. In other words, a consumer can sue the government to force the manufacturer to alter its behavior, but not sue the manufacturer itself. But she seems thereby to intermix standing with cause of action. It may well be that a consumer would have to search to find the appropriate cause of action to support a direct suit against a manufacturer who discontinues a product line, (although I expect it will be found) but, under her theory of injury, the consumer would surely have Article III standing in federal court.[4] Injury here cannot be made to depend on a failure of a government agency to enforce a law against the manufacturer without conceding, it seems to me, that petitioners' injury has little to do with the manufacturer's behavior, but everything to do with the government's. Which is merely another way of saying that the suit is nothing more than an effort to enforce a law for its own sake. In short, Chief Judge Wald's injury analysis falls into an abyss and her jury-rigged "state action" safety net will not hold.
 
 
 189
 Even if brand loyalty is thought to provide a basis for an Article III injury, can it seriously be maintained that the failure to develop a larger number of Ford models than presently exist has resulted in a "distinct and palpable," "particular and concrete," "specific and objective" injury? How particular is an injury that is expressed in terms of an unspecified increase in the number of models with unspecified characteristics? It is a well-known doctrine of standing law that a mere "abstract" injury is not sufficient. O'Shea, 414 U.S. at 494, 94 S.Ct. at 675. But I need not invoke that doctrine here, for although concreteness is certainly absent, more importantly, so is any injury at all. I would suggest that one characteristic of an injury is that we can know when it begins, and when it ends. Consider the allegedly injured consumer in the car lot, looking at a range of, say, eight models of Ford cars. Like Oliver Twist, the consumer would like more and thus claims an injury. But when did the asserted injury begin? When Ford discontinued the Mustang? A few years earlier, when Ford might have decided not to go forward with a solar-powered car? Or some time later, when Ford failed to embark on a major retooling? And when will the injury end? Perhaps when Ford develops ten models, or twelve, or forty. We do not know, nor do we think petitioners could enlighten us.
 
 
 190
 What is more, petitioners do not even argue that their members are presently suffering from this experience of decreased choice, but rather that they expect to suffer from it at some time. Yet "when a litigant alleges only future injury, the harm must be 'certainly impending,' Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)), and 'real and immediate,' City of Los Angeles v. Lyons, 461 U.S. at 102, 103 S.Ct. at 1665. Although '[t]he fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing[,] ... [it can] lessen the concreteness of the controversy and thus mitigate [sic ] against a recognition of standing.' Harrington v. Bush, 553 F.2d 190, 208 (D.C.Cir.1977) (footnote omitted)." CAS I, 793 F.2d at 1343 (Scalia, J., dissenting). Petitioners do not tell us how one would determine the injury has begun. What would the hypothetical world of greater variety, against which injury is measured, look like? Even if it were asserted that this injury is occurring right now, it would be difficult to imagine a less concrete impact. That the allegations here concern some future time moves us still further into the realm of speculation.
 
 
 191
 I am not unsympathetic to my colleagues' effort to identify the injury in this case--it is analytically as difficult as catching a snail darter with one's bare hands. Judge Buckley rests on the assertion that the injury stems from loss of "the opportunity to purchase the more fuel-efficient cars ... GM and Ford would have produced but for the EPA's action," Buckley op. at 869, which necessarily suggests that a consumer is injured when any manufacturer produces a product that is somehow less desirable than that consumer would wish, regardless whether or not a substitute product is available. In my view, that theory of injury cannot possibly be sustained, but since Judge Buckley reserves the question of speculativeness (which is an integral part of an injury determination under Supreme Court precedent, see, e.g., Lyons, 461 U.S. at 102, 103 S.Ct. at 1665). I think Judge Buckley's opinion must be read as concluding that petitioners fail the redressability prong of standing, assuming arguendo there is an injury.
 
 
 192
 Chief Judge Wald, on the other hand, without abandoning petitioners' wider range of options claim,[5] see Wald op. at 849, 851, develops an alternative theory of injury that petitioners never advanced, as far as I can tell, at any stage in this litigation--that EPA's too lax regulation will increase the prices of cars petitioners' members wish to buy.[6] I do not think petitioners' counsel omitted this contention in their pleading or briefs submitted in this case inadvertently. The omission that Chief Judge Wald seeks to correct is not due to inadequate lawyering; rather it is attributable to candid advocacy. The Center for Auto Safety, as is true of certain other consumer groups, has devoted itself to seeking for its members product attributes such as safety, which inevitably are in tension with lower product prices. They are surely well aware that a competitive market will produce the lowest prices for any product, but instead are concerned that consumers en masse, perhaps in their view overly concerned about prices alone, will insufficiently value attributes such as safety that their members desire. Therefore, they have characteristically sued to seek more rigorous regulation, see, e.g., Center for Auto Safety v. Lewis, 685 F.2d 656 (D.C.Cir.1982); Nader v. Volpe, 466 F.2d 261 (D.C.Cir.1972), which indisputably will increase costs and thereby tend to increase prices overall.[7] Obviously, General Motors and Ford intervened in this case to attempt to avoid this increase in cost--which of course would put upward pressure on their prices.
 
 
 193
 I suppose it is possible that increased regulation and thereby increased cost might in a complicated market cause a reduction in price of some affected commodities. But before granting standing to someone who might claim to be interested in such reduction and injured because it will not occur, it seems necessary for that party to set forth allegations that identify with some particularity and plausibility the product they desire that will by virtue of increased regulatory burdens placed upon the manufacturer nonetheless be cheaper.
 
 
 194
 Chief Judge Wald, not petitioners, identifies the product as all Ford and GM cars more fuel efficient than EPA's CAFE goal. Wald op. at 850. Her theory seems to be that Ford and GM would, if the EPA's rule were changed to deprive them of credits, produce some greater number of cars with mileage ratings greater than the CAFE goal. She apparently assumes further that all cars sold in the United States that exceed this moving average constitute a separate market, and therefore that an additional introduction of even one Ford or GM car at this level of fuel efficiency will have some impact on the prices of all cars sold with those attributes. This seems to me to be a painfully inexact identification of the product to which Chief Judge Wald seeks to apply a simple price theory analysis. Product markets are defined by consumer demand and substitution patterns, not by arbitrary performance standards marked off by bureaucratic fiat.
 
 
 195
 Even if the CAFE goal for a particular year did fortuitously coincide with the lower end of the market for fuel-efficient vehicles, it is purest speculation to assert that EPA's existing regulation will lead to future price increases. Assuming for purposes of discussion that the CAFE goal for a particular model year is 26 m.p.g., and that all cars at or above that standard are part of the "fuel-efficient car market," possession of additional credits by Ford and GM could just as easily have no impact on supply in that market--even if one grants the further assumption that Ford and GM will seek to reduce their fleet averages to the allowable minimum. Those companies could, applying the credits, reduce their fleet averages by shifting production from 32 m.p.g. cars to 30 m.p.g. cars, leaving constant (or even increasing) the supply of "fuel-efficient cars." Or they might shift from 18 m.p.g. cars to 12 m.p.g. cars, or simply increase output of 18 m.p.g. cars, again with no impact on supply in the defined market.
 
 
 196
 The picture becomes even more complicated as one takes into account the behavior of Ford's and GM's rivals. If Ford and GM respond to the greater availability of credits in the one way that could have an impact on supply in this hypothetical market, by shifting production across the CAFE goal from, say, 27 m.p.g. cars to 25 m.p.g. cars,[8] there still may be no impact on total market supply and price, as opposed to the supply of GM or Ford automobiles. If the automobile market is competitive--and there is no contrary allegation--the rivals of Ford and GM will respond to decreased output by Ford and GM of "fuel-efficient" cars, and to the anticipated higher price that would accompany this reduction in overall supply, by increasing their own production (since the higher price would generate economic profits for the rivals, leading them to take on greater variable costs) and returning the market approximately to its pre-entry equilibrium. The precise nature of this response would turn on the production function of Nissan, Toyota, Hyundai, Volkswagen and others, allegations--still less information--we do not have before us.
 
 
 197
 Chief Judge Wald ignores altogether the behavior of car manufacturers other than Ford and GM. Thus, Chief Judge Wald hypothesizes an EPA order directing Ford and GM to add $100 to the sticker price of all their cars and asks whether anyone could "seriously question that the resulting price increase would be cognizable?" Id. at 16. It would be, of course, if Ford and GM were to sue because they would be injured competitively, but I do not see how a consumer would be injured--unless he has a legally cognizable interest in buying only those cars. If EPA, on the other hand, directed an increase in the price of all automobiles sold in the United States, we would have an entirely different case--I would then have little doubt that consumers would be injured. But, as I have noted, the EPA's rule is not equivalent to an across-the-board tax.
 
 
 198
 Finally, the market's behavior in light of an EPA rule change would also turn on the magnitude of the change by Ford and GM to which their competitors must respond, which is itself determined by the measure of the impact of EPA's regulatory change. A small regulatory change would probably bring about a small shift by Ford and GM, which could relatively easily be absorbed into the excess capacity of other automobile manufacturers and have no market repercussions.[9] But we have no allegations as to the impact of EPA's rule, as measured by output variation. Nor do we have estimates of the cost curves of the various participants in the relevant "fuel-efficient car" markets.
 
 
 199
 Put plainly, a plausible claim that an EPA rule change regarding the CAFE standard will raise the price of cars in a particular market segment, however defined, would be enormously complex. It would at a minimum require allegations of market definition, allegations that Ford and GM would respond by abandoning the relevant market segment for another, allegations of the nature of competition in that relevant market segment, allegations of the cost curves faced by all automobile makers, and allegations of the size of the impact the regulatory change would have on the market. Perhaps this explains in part why petitioners did not allege this injury--but at any rate we do not have before us allegations that would allow us to guess at, much less predict intelligently, the probable price impact on EPA's actions.[10] Reciting that "the reduction of supply, all else remaining the same, should increase the prices of all substitute goods in the relevant market," Wald op. at 850, n. 9, does not sweep the complexity away; it sweeps it under a rug.
 
 
 200
 Chief Judge Wald argues strenuously that price increases can be cognizable economic injuries. Wald op. at 850-851. I do not disagree. But when we must speculate about whether a price increase will occur--and especially when we do not have sufficient allegations to permit even informed speculation--Article III cannot be satisfied. Chief Judge Wald concedes that the causation prong of standing may not be met if "price increases are so far removed from the EPA's action that they are not substantially likely to occur," id. at 851, and cites to one of our cases refusing standing where the chain of events leading to price increases was "conjectural at best." Common Cause v. Department of Energy, 702 F.2d 245, 252 (D.C.Cir.1983). Although the federal courts theoretically treat the speculativeness of a claimed injured apart from causation analysis, the two inquiries actually run together. The first asks what the likelihood is that any injury will occur, and the second, whether that injury is caused by the alleged illegal action. I would say that speculativeness is a more appropriate categorization than causation where, as here, we are faced with a prediction of market behavior which does not even identify the variable or mechanism that would lead the predicted behavior to occur--where only the specter of a price increase is raised and the barriers to suit are expected to evaporate.[11] My arguments regarding speculativeness are thus similar to the concerns we voiced in Common Cause: "Yet where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." Id. at 251. This court's refusal to recognize standing in Common Cause, because the court had no reason to expect an energy-use plan plaintiffs sought to result in less consumption than the plan then in place, seems to me to be persuasive precedent for denying standing on Chief Judge Wald's theory. Here too, we have no basis in pleadings for expecting the desired EPA rule to push prices in some vaguely defined market lower than they are under the existing rule. Indeed, since Judge Buckley and Judge Williams reserve this question in their opinions, there is no majority of this court for the proposition that the asserted injury is not speculative. The absence of any holding in CAS I regarding the speculativeness of this price increase injury thus seems to leave the question unsettled.
 
 
 201
 * * *
 
 
 202
 * * *
 
 
 203
 Of course, focusing on the injury or lack thereof suffered by a hypothetical member of petitioners' organizations misses the real point of this lawsuit. Although I would have thought it beyond dispute that the Article III injury requirement is not satisfied merely because a petitioner has a political or ideological interest in seeing a federal law enforced against a third party, see United States v. Students Challenging Regulatory Agency Practices, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973) ("SCRAP "); see also Valley Forge, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700, that is ultimately all that is at stake here. This is really the case of the missing plaintiff. A public interest organization, with undoubtedly admirable motives, is attempting to have the courts correct what it strongly believes to be unlawful behavior on the part of EPA. But we do not sit as an agency ombudsman, open to complaints by concerned citizens that government officials are not performing their statutory duties. Granted, in some situations, as in this case, the absence of judicial intervention will create an ostensible asymmetry in judicial review of agency action;[12] if the EPA enforces the Act too severely, the auto makers will be injured and thus will have standing, yet if the EPA relaxes its enforcement, no individual will be injured, and thus no one will have standing to complain. The Supreme Court, however, has emphatically stated that, even when errors of fundamental constitutional importance on the part of government officials have been alleged, "the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767; see also United States v. Richardson, 418 U.S. 166, 179-80, 94 S.Ct. 2940, 2947-48, 41 L.Ed.2d 678 (1974). We should not, by ignoring the requirement of a "distinct and palpable" injury, avoid this rule. And we should be sobered by the realization that if petitioners can bring this action, it follows that any resident of the United States (perhaps any visitor) who can show a present or future interest in purchasing an automobile would have standing. The only difference between such an individual and petitioners is the latter's intense political interest in the administration of the statute. Chief Judge Wald's concern that if we do not find injury here, consumer groups will not be able to sue to ensure adequate enforcement of this law is therefore irrelevant to Article III analysis. The same might be said in behalf of a victims' rights group that asserts standing to seek more vigorous enforcement of the criminal law. Consumer advocacy, like "taxpayer or citizen advocacy, given its potentially broad base, is precisely the type of leverage that in a democracy ought to be employed against the branches that were intended to be responsive to public attitudes about the appropriate operation of government." Richardson, 418 U.S. at 189, 94 S.Ct. at 2952 (Powell, J., concurring). Unless an individual or interest group can show Article III injury because of governmental action, their redress is to be found under our constitutional system at the polls--not in Federal courts.[13]
 
 
 204
 That is not to say that if a concrete injury is suffered by many, no one of the many has Article III standing to sue. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). It is to say, rather, that if virtually any American could bring suit on the injury petitioners assert, we must be careful to delineate the "distinct and palpable" injury suffered lest we turn the injury component of Article III into a paper barrier and thereby convert the federal judiciary into a referee of political disputes. Chief Judge Wald's opinion relies on Supreme Court standing decisions in environmental cases to support its views of Article III injury here. Wald op. at 853-54. But I do not believe the reasoning of these cases applies where, as here, only a consumer interest is asserted, for there appears to be some tension between the Supreme Court's standing analysis used in environmental cases and that employed in virtually all other cases.[14] Compare Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) and Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) with Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). I think that is because defining a plaintiff's injury in environmental cases has presented peculiar conceptual problems. The court has required plaintiffs to show an impairment or threatened impairment of their actual enjoyment of a specific aspect of the environment. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).[15] But, the court has assumed sub silentio that all parts of the environment are unique and precious to those exposed to those parts. For example, in American Cetacean, it would have obviously been unavailing for defendants to argue that a diminution of whales for California whale watchers would not constitute injury if there remained an adequate number of dolphins to observe.
 
 
 205
 That is not because the Court has placed a higher value on claims of environmental injury as opposed to discrimination claims or economic claims. Rather, the Court has refused to place a value on any individual's environmental preferences--because there is no commonly accepted measurement of that value.[16] But to extend the environmental concept of injury over to consumer preferences would be to trivialize it. An automobile model or a particular brand of wristwatch or even a kind of battery may be unique in some sense and thus gain consumer loyalty, but to say a reduction in its supply causes injury as does the threatened disappearance of a species is to confuse the variety of goods manufactured by man with that which nature produces. In poetic terms, since "only God can make a tree," a person who enjoys sitting under it is uniquely injured by its destruction; man cannot replace that exact tree. Still, even in the environmental cases, the Supreme Court has, as I have noted, required a showing that individuals' enjoyment of a specific aspect of the environment is jeopardized by a challenged action before recognizing an Article III injury. Petitioners do not clear even that hurdle. In sum, by recognizing petitioners' consumer injury here, my colleagues virtually eliminate the injury requirement in Article III jurisprudence and this approach, unless corrected, will take the federal judiciary on a journey whose destination, although unclear, surely is far removed from constitutional premises.
 
 II.
 
 206
 Even if any perceptible diminution in the availability of what are called loosely "fuel-efficient" Ford or General Motors care were to constitute Article III injury, EPA's actions cannot be said to cause that injury with the degree of confidence necessary to satisfy the second prong of Article III standing analysis, nor can an order of this court be seen adequately to redress petitioners' injury so as to meet the third prong of Article III. See Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758.
 
 
 207
 It seems obvious that the grievance a court determines to be caused by the complained of activity and redressable by court order must be the same grievance that creates injury-in-fact. The treatment of causation and redressability in Chief Judge Wald's opinion sometimes shifts from describing the injury as failure to force technology to failure to increase production of existing models. See, e.g., Wald op. at 858. ("Although in August 1985 automobile manufacturers may not have been able to 'redesign' MY 1987 or MY 1988 vehicles, they could have increased the supply offered of fuel-efficient cars.... To meet the standing requirement petitioners need only show a substantial likelihood that automakers could have taken any steps in response to improve the overall fuel-economy of their MY 1987 and MY 1988 offerings, and thereby partially redressed petitioners' injuries."). Only the latter failure to increase production, however, is identified as an injury in the section of her opinion dealing with injury-in-fact. By treating these distinct theories of injury as interchangeable, Chief Judge Wald has constructed a whole that is a good deal more than the sum of its parts. A general interest in forcing technology cannot provide injury, although that grievance, if cognizable, might be redressed by court order. And that interest is surely not the same as an interest in the greater supply of certain existing models at a hypothetical "low" price, for the new technology could create a very high mileage car for which there was great demand, such that its price was very high and the overall number of "fuel-efficient" cars Ford and GM were forced to sell to comply with the Act declined. Conversely, there is no substantial probability that relief under the Act would increase the production runs of certain cars by Ford and GM--they could respond with new and expensive technology or reduced production of less fuel-stingy models.
 
 
 208
 But the central argument between Judge Buckley and Chief Judge Wald over causation and redressability, focusing as it does on Congress' findings on the projected effect of the statute, is beside the point. It is a debate over whether stricter enforcement of the Act will place the pressures on automobile manufacturers that Congress intended to create. Will the credit provisions of the Act force technological change? Or, put another way, will raising fleet standards raise the average level of fuel efficiency?
 
 
 209
 This dispute is unrelated to petitioners' stated desire for available variety, of course, because even if a stiffer EPA posture did result in a technological breakthrough, a manufacturer might respond by discontinuing or reducing the production of existing models. (Conversely, the variety of relatively fuel-efficient cars could be increased even absent technological improvement). And the technological breakthrough may improve the economy of "non-fuel-efficient" cars, not the subject of this suit. Further, an unspecified interest in technological advances that would raise fleet fuel economy averages provides no injury-in-fact since, as I have discussed, its impact on the individual consumer is wholly speculative and there is no cognizable interest in general enforcement of the law. It may well be true that an interest in seeing new technologies that lead to across the board increases in CAFE ratings would be vindicated by an order driving EPA to stiffer enforcement; that remedy, however, bears no relation to the injury of decreased variety (or Chief Judge Wald's reduced production of existing varieties) that was the genesis of this lawsuit. Indeed, as I indicated, that remedy might result in the production of one, and only one, super efficient car in each fleet.
 
 
 210
 The difficulty is that Congress had a broader, less differentiated purpose than that asserted by petitioners. Its objectives could be satisfied by various actions of the automobile manufacturers, only one of which even arguably redresses petitioners' injury. That is why, in questioning whether a favorable ruling would redress the injury asserted by petitioners, I am not, as Chief Judge Wald's opinion at 856-57 suggests, giving short shrift to a congressional finding of causation underlying the Act. I do not dispute that Congress determined that the "credit-penalty carryover system would in fact spur fuel-economy gains," Wald op. at 856. But the fuel economy gains with which Congress was concerned were in the fleet-wide, across-the-board averages, as the structure of the Act makes plain. It is irrelevant to this case that Congress has said raising the standard automobile manufacturers must meet will lead the latter to increase the average fuel economy of their fleets, or that a judicial order raising the standard is likely to have the same effect. Petitioners do not, cannot, come to us to ask that the general level of fuel efficiency be raised on average. They seek only a wider variety of "fuel-efficient cars," and there is no congressional finding that raising the fleet average will generate increased consumer choice.
 
 
 211
 Therefore, while I agree with the conclusion of Judge Buckley's opinion that the injury, if it be such, of the deprivation of a wider variety of fuel-efficient cars is not redressable by any relief we can offer, I would rely on a simpler rationale. We have long recognized that the intervening, uncontrolled activities of parties not before the court defeat our power effectively to direct relief, see, e.g., Simon, 426 U.S. at 41-42, 96 S.Ct. at 1925-26, and the Energy Policy and Conservation Act leaves automobile makers considerable freedom in responding to any direction we might give the EPA, destroying our power to redress petitioners' members' injury.
 
 
 212
 Congress did not require the EPA to order the manufacturers to develop a "broader range of fuel-efficient cars." Rather, the statute's fleet average mechanism allows a number of responses. See CAS I, 793 F.2d at 1344 (Scalia, J., dissenting). A manufacturer might raise its fleet average by raising the price of its less fuel-efficient cars, decreasing their sales and making consumers worse off. It might lower the price of existing fuel-efficient cars, or promote them in some other manner with no impact on available variety. Or it could boost the fuel efficiency of the lower end of its production spectrum, leaving untouched the more efficient cars that concern petitioners' members. A manufacturer can also control its fleet average by transferring the production of some cars overseas, in effect taking those cars out of its fleet,[17] or by shifting production from passenger vehicles subject to the rule at issue in this case to, for instance, vans or light trucks, see 49 C.F.R. Sec. 523.4 (1987). It might even elect to pay fines and fall below the mandated average; at least one manufacturer has done so. Of course, not every manufacturer need select the same alternative from this list for the impact on variety to be nullified. The "herd scenario" rejected by Chief Judge Wald's opinion is thus irrelevant. Wald op. at 860.
 
 
 213
 Where the response to our order might take any of these plausible, indeed likely, forms, many of which would not affect the "injury" at which we aim, we cannot say there is a "substantial likelihood" that a favorable decision would redress the asserted injury, and we therefore have no power under Article III to act. What petitioners really ask of us is an order turning the Energy Policy and Conservation Act into a statute that requires the development of a wide variety of fuel-efficient cars (something Congress did not contemplate) or that seeks to redirect the automobile market in a manner more satisfactory to petitioners. Any harm is traceable to these sources, not to the alleged failure of the EPA to enforce the existing law. I would reject petitioners' claim of standing on these grounds of traceability and redressability as well as for failure to demonstrate injury-in-fact.
 
 
 214
 * * *
 
 
 215
 * * *
 
 
 216
 The Supreme Court for many years has rejected the proposition that taxpayers have standing to challenge government actions of which they disapprove. In doing so, the Court has noted
 
 
 217
 As our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than at any period of our national development. The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must have a "personal stake in the outcome," Baker v. Carr, [369 U.S. 186] at 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ] or a "particular, concrete injury," Sierra Club, [405 U.S.] at 740-741, n. 16 [92 S.Ct. at 1369, n. 16] or "a direct injury," Ex parte Levitt, [302 U.S. 633] at 634 [58 S.Ct. 1, 82 L.Ed. 493 (1937) ]; in short, something more than "generalized grievances," Flast [v. Cohen ] [392 U.S. 83] at 106 [88 S.Ct. 1942, 1956, 20 L.Ed.2d 947 (1968) ].
 
 
 218
 United States v. Richardson, 418 U.S. 166, 179, 94 S.Ct. 2940, 2948, 41 L.Ed.2d 678 (1974).
 
 
 219
 We are all consumers even more than we are all taxpayers. This case is for that reason more analogous to the taxpayer suits than it is to the environmental cases where we and the Supreme Court have been careful to require a showing, at least at the summary judgment stage, of proximate harm to plaintiffs. And, if any consumer in the United States can bring an action based on his frustrated consumer preference, we will have expanded Article III beyond the point it would have reached if general taxpayer standing had been permitted. For as I have explained, there is no conceivable Article III "state action" limitation which would preclude suits against producers directly.
 
 
 220
 I would therefore overrule the holding in CAS I.
 
 
 221
 WILLIAMS, Circuit Judge, concurring in Circuit Judge BUCKLEY'S opinion:
 
 
 222
 I concur in Judge Buckley's opinion, with a single reservation: I am frankly uncertain whether the interest of plaintiffs' members in "the future availability of vehicles having a greater fuel efficiency than those GM and Ford would otherwise produce," Buckley Op. at 848, meets currently prevailing standards for the constitutionally necessary minimum injury. If the standard is still an "identifiable trifle," see United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417, n. 14, 37 L.Ed.2d 254 (1973), then I suppose the interest makes the grade. But as Judge Silberman points out, the Court has recently employed adjectives that seem more demanding: "distinct and palpable," "particular [and] concrete," "specific and objective," all in contrast to injuries that are "conjectural [or] hypothetical," "remote and unsubstantiated by allegations of fact," or "abstract." Silberman Op. at 876 (internal quotations omitted). Persuaded by Judge Buckley's treatment of the causation and redressability element of constitutional standing, however, I refrain from an effort to resolve the point. One is reminded, again, of Professor Davis's caustic remark that standing law suffers from "inconsistency, unreliability, and inordinate complexity." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE Sec. 24.1 at 208 (2d ed. 1983).
 
 
 
 *
 Judge Bork, a member of the court when the case was argued, did not participate in this decision
 
 
 [1]
 According to the Senate Report on the EPCA, the automobile "stands out as the single largest end user of petroleum, accounting for nearly 40 percent of present consumption." S.Rep. No. 179, 94th Cong., 1st Sess. 2 (1975) U.S.Code Cong. & Admin.News 1975, p. 1762; see also id. at 3 (" 'if we are unwilling to face up to the problem of the automobile, we might as well forget about the goal of energy conservation' ") (quoting Environmental Protection Agency official)
 
 
 [2]
 That task was in turn delegated by the Secretary of Transportation to the National Highway Traffic Safety Administration. See 41 Fed.Reg. 25,015
 
 
 [3]
 A manufacturer expecting to fall below the CAFE requirements for a particular model year may submit a plan demonstrating that during the subsequent three years it will earn sufficient CAFE credits to offset the projected shortfall. 15 U.S.C. Sec. 2002(l )(1)(C). In essence, manufacturers may mortgage their future fuel economy improvements to avoid falling into violation of the law
 
 
 [4]
 In a separate one-paragraph concurrence, then-Judge Bork stated that he concurred in the standing section of the panel's opinion "only because we are bound on the issue of standing by the prior panel opinion" in CAS I. Id. at 1080
 
 
 [5]
 Even were we to reconsider CAS I and hold that the "any person" language of Sec. 2004(a) does not wholly tear down these prudential standing barriers, see, e.g., Bread Political Action Committee v. Federal Election Commission, 455 U.S. 577, 584, 102 S.Ct. 1235, 1239, 71 L.Ed.2d 432 (1984), no prudential standing principle counsels denial in this case. This case involves no "generalized grievance" common to all citizens, as in Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), but rather involves a specific injury shared by a specific group of fuel economy minded automobile consumers. See, e.g., Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972) ("the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process"); Common Cause v. Department of Energy, 702 F.2d 245, 251 (D.C.Cir.1983) (the "wide-spread character of an alleged injury does not demean the standing of those who are injured"). The interest petitioners assert in enjoying as consumers the fruits of fuel-saving measures is also plainly within the zone of interests protected by the EPCA
 
 
 [6]
 The fourth petitioner, Environmental Policy Institute (EPI), sues on its own behalf, alleging that its "institutional interests in promoting conservation ... are adversely affected" by the EPA's final rule. Because we conclude that the three other petitioners have standing, we need not reach out, as do our four colleagues, to decide EPI's standing. See Watt v. Energy Education Action Foundation, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981)
 
 
 [7]
 The primary interests which the three membership-association petitioners seek to advance is the enhancement of the availability of fuel-efficient automobiles and trucks. That goal is surely germane to these organizations' goal of improving fuel-conservation. See Humane Society of the United States v. Hodel, 840 F.2d 45, 52-60 (D.C.Cir.1988) (discussing germaneness requirement of the Hunt-UAW test). Additionally, because the relief petitioners seek does not take the form of individualized monetary awards, their claim does not require the participation of individual members. See Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975)
 
 
 [8]
 It is not responsive to argue that CAS did not frame its injury in this manner until this en banc. Standing was simply not a disputed issue at the panel stage, precisely because the CAS I precedent seemed so squarely controlling. See 806 F.2d at 1075. Thus, CAS's first explication of its injury in the context of standing analysis took place in the supplemental briefs it submitted at the en banc level. See Church of Scientology of California v. Internal Revenue Service, 792 F.2d 153, 166 (D.C.Cir.1986) (agency allowed to raise new argument on appeal when doing so was "at the first moment when it was appropriate and relevant to do so"). We forego analysis of CAS's additional claims--that the EPA's actions will drive up oil prices, and that the members of the public interested in generally enjoying the benefits of energy conservation whom CAS claims to represent will suffer from diminished conservation--only because we find cognizable injury-in-fact elsewhere, and therefore need not reach out to pass judgment on these alternative theories. See Watt, supra, note 6
 
 
 [9]
 In ridiculing the fear that the EPA's order will drive up the prices of fuel-efficient cars, Judge Silberman resorts to some surprising assumptions about the automobile industry. The record in this case in no way suggests (and common knowledge belies) that the market for automobiles is the rare one in which demand is wholly price-inelastic, and thus that a drop in supply of fuel-efficient cars would not affect the prices of these vehicles. Nor is there evidence suggesting, as Judge Silberman would hypothesize, that product differentiation will necessarily confine the impact of the EPA's order to a few select models, or that the elimination of fuel-efficient Ford and GM offerings will have no effect on the market prices of competitors' similar offerings. Silberman Opinion at 880-81. Quite the contrary: the reduction of supply, all else remaining the same, should increase the prices of all substitute goods (including those of Ford's and GM's competitors) in the relevant market, regardless of their brand name. Judge Silberman finally argues that because regulations encouraging "product attributes such as safety" tend to drive prices up, CAS's price injury is counterintuitive. Id. at 879-80. That is wrong. CAS is not concerned about the availability and price of cars, but only of fuel-efficient cars. Thus the relevant comparison is not between the price of cars in the era of regulatory laissez-faire and the price of cars today, but between the availability and price of fuel-efficient cars before, and after, the EPA ruling under challenge here
 
 
 [10]
 Although CAS's standing does not turn on this point, it bears mention that the same reduced supply/higher price injury is replicated when CAS's members attempt to purchase vehicles in the secondary or used car market. Injury to secondary market purchasers comes about in two ways. First, the fewer fuel-efficient vehicles that are bought and sold initially, the fewer fuel-efficient cars that will be available a few years later to second-hand purchasers. Additionally, there is a disinformation injury perpetrated by the EPA's failure to correct the fuel-efficiency ratings of MY 1980-MY 1986 vehicles. Fuel-conservation-minded consumers like petitioners' members are precisely the people who persist in seeking out information about the fuel efficiency of second-hand vehicles. Without retroactive adjustments to earlier CAFE overratings of fuel economy, the information those consumers get about second-hand cars will be distorted and misleading, further limiting their ability to select wisely among available vehicles
 
 
 [11]
 Of course, even an "identifiable trifle" of a price increase will suffice. See United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)
 Nor is it an answer that the economic injury petitioners allege has not yet occurred. Not only actual injuries, but threatened ones as well, are constitutionally cognizable. See Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758. In cases such as this, involving an injury to petitioners resulting from the reactions to government action by third-party actors in the private sector, the inquiry requires a "credible allegation" that the plaintiff will be harmed by the government's action. See Wilderness Society v. Griles, 824 F.2d 4, 11-12 (D.C.Cir.1987). Numerous Supreme Court decisions finding standing have involved chains of events that were far less certain to occur. These rulings underscore the fact that a party need not demonstrate to a certainty that the threatened injury will occur. See, e.g., SCRAP; Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Japan Whaling Association v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).
 What is more, experience demonstrates the sobriety of petitioners' concern that auto manufacturers, armed with the sizable number of CAFE credits which the EPA's action provides, will delay development and sale of maximum fuel-efficient models. Ford and GM, for example, amassed significant numbers of CAFE credits during MY 1981 and MY 1982 when demand for small vehicles increased dramatically. This surplus gave the companies the freedom to market vehicles below applicable standards during MY 1983 to MY 1985. See NHTSA Final Regulatory Impact Analysis (Sept. 1985) (attached as Addendum to Reply Brief for Petitioners on Rehearing En Banc); see also Passenger Automobile Average Fuel Economy Standards: Model Year 1986, 50 Fed.Reg. 40, 541-44 (1985) (describing shortfalls in CAFE ratings during MY 1983-MY 1985 period); Passenger Automobile Average Fuel Economy Standards for Model Years 1987-88, 51 Fed.Reg. 35,607 (noting, as example of decision to market automobiles below achievable levels, GM's decision to "delay[ ] its GM-10 body coupe for 1988, reducing fuel economy by 0.3-0.4 mpg"). Congress fully expected its incentives to work in this fashion: it found that relying on auto makers' voluntary efforts "offers at best a lower level of fuel savings for a higher level of pollution," and that manufacturers are likely to respond to the lightening of economic pressure by relaxing their commitment to achieving substantial fuel economy. See S.Rep. No. 179, 94th Cong., 1st Sess. 6-8 (rejecting proposal to rely on voluntary compliance by industry as historically "not represent[ing] any commitment at all by the industry," and noting that industry may perceive "economic disincentives in pursuing a voluntary program too diligently ... because, historically, the biggest and least fuel efficient cars have been associated with the highest profits").
 
 
 [12]
 In accepting as cognizable the injury which CAS members allege, we have, Judge Silberman argues, "opened the federal courts for any devotee of a particular product to sue over a decision to stop producing that product." Silberman Opinion at 4-5. His fears are unfounded. First, the state action requirement, operating entirely apart from the standing requirement, would obviously screen out the vast majority of consumer-preference grievances, for a consumer aggrieved about the disappearance of his favorite brand would have to find a cause of action against a governmental body or face dismissal for failure to state a claim. In any event, of those claims that remain, the independent causation requirement of the standing requirement would bar the tenuous claims Judge Silberman fears from ever reaching the merits. Only those consumers who could prove that a "substantial likelihood," see Duke Power Co., 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20, existed that the governmental action would eliminate the particular good in question could ever have their substantive claims adjudicated. See, e.g., Common Cause (dismissing consumer claim on causation grounds after having found injury-in-fact)
 
 
 [13]
 For example: do mortals alone bear full responsibility for creating cars? Or does the chain of causation extend to a higher being that predetermines all? Ontological concerns notwithstanding, the specification of divine creation as a determinant factor in standing doctrine is problematic under Establishment Clause doctrine. See Edwards v. Aguillard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)
 
 
 [14]
 See, e.g., Watt v. Energy Action Educational Foundation, 454 U.S. at 161, 102 S.Ct. at 212 (1981) (holding that California had standing to complain that it was not receiving enough income from offshore royalties because the Secretary of the Interior had refused to experiment with noncash bonus bidding alternatives, even though Secretary could, after experimenting in other locations, continue to employ cash bids in California); Bryant v. Yellen, 447 U.S. 352, 368, 100 S.Ct. 2232, 2241, 65 L.Ed.2d 184 (1980) (holding that plaintiffs seeking to purchase lands in Imperial Valley had standing to to compel application of federal reclamation requirements to those lands, because that measure would likely lead, although not compel, some landowners to sell their lands at below market value); see also Autolog Corp. v. Regan, 731 F.2d 25, 31 (D.C.Cir.1984) ("[w]e are concerned here not with the length of the chain of causation, but on [sic] the plausibility of each of the links that comprise the chain") (citations omitted); ILGWU v. Donovan, 722 F.2d 795, 811 ("[t]he appellants need not negate every conceivable impediment to effective relief no matter how speculative"); see also cases cited on third-party causation, infra
 
 
 [15]
 Our colleagues evade the substantial case authority endorsing the crediting of congressional factfinding in jurisdictional inquiries by noting that this case involves redressability, not simply causation. This is not a tenable argument. As the Supreme Court has noted, causation and redressability are merely different sides of the same coin. See Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. Only when the relief requested goes beyond the alleged legal violation--a situation plainly not at issue here--do the inquiries diverge. Id
 
 
 [16]
 As we previously noted in our discussion of the injury-in-fact requirement, between MY 1980 and MY 1982, for example, Ford and GM amassed hundreds of millions of dollars of CAFE credits after demand for the companies' small cars peaked in the wake of the 1979 oil shortage. During the ensuing three motor vehicle years, the two companies marketed vehicles which, measured in terms of fleet averages, ranked well below the relevant CAFE standards. Cushioned from liability by the surplus credits, the auto makers were able to produce, for instance, large rear-wheel drive vehicles which they had planned to phase out. At the same time, they delayed the introduction of lighter and more fuel-efficient front-wheel drive models. The CAFE credits thus allowed Ford and GM to respond to the resurgance of consumer demand in larger, less fuel-efficient cars during these years. See Passenger Automobile Average Fuel Economy Standards, Model Year 1986, 50 Fed.Reg. 40,528, 40,531
 
 
 [17]
 Our four colleagues respond that it is unrealistic to use a six-year time frame in evaluating the impact of the unjustified credits because "it was clear" by mid-1985 that Ford and GM stood to garner no credits in MY 1987 and MY 1988--and thus they would have none to carry back or forward. See Buckley Opinion at 872. The sole support they offer for this predictive insight into the future of the automobile industry are the statements to this effect of Ford and GM to NHTSA when in March 1985 they petitioned for a reduction in the 27.5 mpg MY 1987 and MY 1988 standards. Setting aside for a moment the legitimacy of using these inherently self-serving assertions of the car manufacturers as a basis for denying standing to its plaintiff-consumers, the fact is that Ford and GM won from NHTSA a considerable reduction of 1.5 mpg in the MY 1987 and MY 1988 CAFE standards to 26 mpg, a fact which renders irrelevant their complaints about the difficulty of meeting the 27.5 mpg goal. See 51 Fed.Reg. 35,594 (1986)
 In any event, the history of Ford's and GM's past compliance with the EPCA suggests that paying penalties would be a wholesale policy reversal. Neither company had ever paid a fine for falling short of the EPCA's standards. Indeed, both had repeatedly vowed not to do so. See supra. Moreover, as we explain at greater length in the ensuing text, steps existed--including simply varying the quantity supplied, and thereby reducing the price, of fuel-efficient vehicles--by which a manufacturer could increase the greater availability of relatively fuel-efficient cars. See infra.
 
 
 [18]
 NHTSA's statement that CAFE standards for model years 1987-88 were set at "maximum feasible" level does not mean that no further technological improvement is possible. "Maximum feasibility" is a statutory term of art which takes into account four different factors: technological feasibility, economic practicability, the effect of other federal motor vehicle standards on fuel economy, and the need of the nation to conserve energy. 15 U.S.C. Sec. 2002(e)
 
 
 [19]
 The critical quote on which our colleagues rely for their "lead time" theory states that
 the leadtime necessary to design, tool, and test components such as new body sheet-metal subsystems for mass production is typically 22 to 29 months. Other potential major changes often take longer. Lead times for new vehicles are typically at least three years.
 Id. at 35,603 (emphasis added). Just three pages later, however, NHTSA states that smaller technological improvements are still possible, including ones the Department of Energy specifically found could be introduced by MY 1987 and MY 1988:
 These include front-wheel drive, aerodynamic improvements, material substitution, four-speed automatic transmissions, and fuel injection.
 Id. at 35,606.
 NHTSA's comments with regard to the potential for introducing fuel-saving 4-speed transmissions makes abundantly clear the distinction, elided by our four colleagues, between "major changes" impractical in the short-term and more feasible modest modifications:
 While, as discussed above, NHTSA has concluded that GM can install a higher number of 4-speed transmissions in certain mid-size cars for MY 1987, inclusion of this factor in GM's capability adds less than 0.1 mpg to that company's CAFE.
 Id. at 35,607.
 
 
 [20]
 Moreover, NHTSA deliberately set MY 1987 and MY 1988 CAFE standards below the major manufacturers' acknowledged level of attainability. For example, NHTSA used the lower projection of capability of the two companies for each year to prescribe industrywide standards. Id. at 35,605. In so doing, the agency automatically allowed one or the other of the two major auto makers to exceed the new standards and earn CAFE credits for doing so. Id. Additionally, NHTSA's MY 1987 and MY 1988 standards also "accounted for uncertainties by providing a slight downward adjustment to the CAFE levels that seem achievable in advance of the model years." Id. at 35,604. This additional regulatory cushion provides room for manufacturers to exceed standards and earn credits. See also id. at 35,618 (noting GM's "extraordinary efforts to exceed its MY 1985 shortfall by exceeding MY 1987-1988 standards" and observing that if these efforts succeed, "the credit provisions would have the effect intended by Congress of encouraging manufacturers to do more to improve fuel economy than they otherwise might")
 
 
 [21]
 See also Root & Drescher, "Auto Fuel Economy Standards and Energy Conservation Issues," reprinted in Staff of House Comm. on Science and Technology, 95th Cong., 2d Sess., The Economic Impact of Energy Conservation 250 (Committee Print 1978) ("The manufacturer's view is that the standards will be met because there is no legal choice. Officers of GM and other auto firms have testified on this point before Congress, in DOT rulemaking hearings, and in correspondence with many federal agencies.... [T]he firms believe there are compelling legal reasons for meeting the standards.") The seriousness of this commitment, and the fact that the law is working as Congress intended, is underscored by the fact that only one automobile company, Jaguar, which sells 12,000 to 15,000 cars a year, 51 Fed.Reg. 6341, 6345, has ever paid the EPCA penalties. It did so in MYs 1983-84
 As for our colleagues' argument that this case does not involve "forward planning" but rather is one in which manufacturers have no legal options, see Buckley Opinion at 873, the fact that Ford and GM do have the option of complying with the EPCA by making modifications in their fleets, as demonstrated above, obviously renders this line of reasoning incorrect.
 
 
 [22]
 The Arlington Heights Court did not rest its jurisdictional finding on MHDC's standing alone, however, because it was unclear that as a corporation, without racial identity, it could complain of racial discrimination by the municipal zoning board. Nonetheless, the Court concluded that an individual plaintiff had standing to complain of the racially discriminatory rezoning that precluded MHDC from building the Lincoln Green project:
 The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a "substantial probability," Warth v. Seldin, supra, 422 U.S. at 504, 95 S.Ct. at 2208, that the Lincoln Green project will materialize, affording Ransom the housing opportunity he desires in Arlington Heights. His is not a generalized grievance. Instead as we suggest in Warth, supra, at 507, 508 n. 18, 95 S.Ct. at 2209, 2210 n. 18, it focuses on a particular project and is not dependent on speculation about the possible actions of third parties not before the court.
 Arlington Heights, 429 U.S. at 264, 97 S.Ct. at 563. In sum, Ransom had standing to complain about a zoning ordinance that precluded MHDC from putting up a housing project. He did not have to prove that MHDC would succeed in doing everything else necessary to put up Lincoln Green once the zoning barrier was lifted, nor that he would succeed in getting one of the units at Lincoln Green if and when it was completed. He only had to state that he would "probably move there," and that there was "substantial probability" that Lincoln Green would "materialize." Id.
 As for our colleagues' contention that Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), "demonstrate[s] vividly" the insufficiency of petitioners' causation showing, see Buckley Opinion at 873, it is decidedly not so. Two major points of distinction are immediately apparent. First, in Simon, Congress never made any statutory findings supporting causation as it has here. See supra. Thus, the Simon Court concluded that it was "purely speculative" whether the Internal Revenue Service requirement under challenge would in fact cause hospitals to deny services to indigents. Id. at 42-43, 96 S.Ct. at 1926. Second, the agency sued in Simon had no power to order the third-party hospitals to act in a fashion that would repair or prevent the plaintiffs' injury. By contrast, the agency action sought here by CAS would under the EPCA's enforcement scheme, directly result in a declaration that Ford and GM were in violation of the law. This violation could only be prevented (or cured) by the production of cars that on the average are more fuel efficient--a step that would squarely redress petitioners' injury. See supra.
 
 
 [23]
 See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, --- U.S. ----, ---- n. 16, 107 S.Ct. 1232, 1243 n. 16, 94 L.Ed.2d 472 (1987) (renouncing proposition that "courts have 'a license to judge the effectiveness of legislation' "); Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984) ("Of course, this Act, like any other, may not be successful in achieving its intended goals. But 'whether in fact the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if ... the ... [state] Legislature rationally could have believed that the [Act] could promote its objective.") (emphasis, omissions, modifications in original); Oregon v. Mitchell, 400 U.S. 112, 247-48, 91 S.Ct. 260, 326-27, 27 L.Ed.2d 272 (1970) (opinion of Brennan, White and Marshall, JJ.) ("The nature of the judicial process makes it an inappropriate forum for the determination of complex factual questions.... Courts, therefore, will overturn a legislative determination of a factual question only if the legislature's finding is so clearly wrong that it may be characterized as 'arbitrary,' 'irrational,' or 'unreasonable' "); Fireman v. Chicago, R.I. & P.R. Co., 393 U.S. 129, 138-39, 89 S.Ct. 323, 328, 21 L.Ed.2d 289 (1968) ("[t]he District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case was 'pure speculation' ") (quoted in Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979))
 
 
 [1]
 I agree that the Environmental Policy Institute lacks standing for the reasons stated in Judge Buckley's opinion. See Buckley op. at 866-67
 
 
 [2]
 Petitioners also seek redress on behalf of their members who suffer from the higher gasoline prices alleged to be the inevitable result of EPA's challenged actions. This theory emerged for the first time in the course of our rehearing of the case en banc, and putting it forward now is equivalent to seeking leave to amend a complaint. I would deny the requested amendment. Otherwise, we would in effect begin a new lawsuit and spawn a potentially infinite process. (I think incorrect Chief Judge Wald's suggestion, at 849 n. 8, that this theory of injury is timely raised because petitioners relied on the precedent of CAS I and therefore did not need to explain their injury. CAS I did not deal with this separate issue of gasoline prices; if petitioners were injured in ways not treated by existing cases, it was their duty to make the relevant arguments.) Moreover, absent some change in circumstances, it is odd to suggest that an injury, the motivating force that drives litigants to seek redress, see generally Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 152-53 & n. 1, 90 S.Ct. 827, 829 & n. 1, 25 L.Ed.2d 184 (1970) (distinguishing injury in fact from the existence of a legal interest), came to petitioners' attention only late in the course of rehearing en banc. A lawsuit is not a continuing dialogue with the judiciary in which a party may try different theories of standing until one succeeds
 As to the substance of this asserted injury, I agree with the analysis on pages 868-69 of Judge Buckley's opinion. Whether these arguments are cast as affecting the speculativeness or the redressability of the injury, they demonstrate its insufficiency for Article III.
 
 
 [3]
 For every model year in question, a substantial number of the major automobile manufacturers in the United States market exceed the fleet standards by a considerable margin. Compare 49 C.F.R. Sec. 531.5 (1987) with 50 Fed.Reg. 27,172, 27,184-85 (1985). Chrysler, for instance, actually opposed EPA's proposed rule. There is no reason to expect that companies whose chosen market niches place them beyond the practical reach of the Energy Policy and Conservation Act will respond to incremental changes in the implementation of the Act, which affect only a few manufacturers
 
 
 [4]
 Causation would certainly be easier to establish--not harder as Chief Judge Wald suggests--if the consumer could sue the manufacturer directly
 
 
 [5]
 Chief Judge Wald calls this argument a "straw man." Wald op. at 849. Perhaps, but it was erected by petitioners
 
 
 [6]
 She first draws from petitioners' brief a statement "consumers are injured because automobiles save less energy and use more gasoline than Congress intended," which appears to me to suggest that petitioners' interest is merely to act as Congress' advocate. Then Chief Judge Wald interprets that phrase as meaning something quite different--that "as a result of the EPA's illegal actions, its members will have to pay more money to obtain identical performance," both because reduced supply of "fuel-efficient" cars will raise the price of such cars and because consumers forced by this price movement to buy "non-fuel-efficient" cars will face a higher cost-per-mile when they drive. Wald op. at 849-50
 The second part of this argument, regarding the cost of operating the "non-fuel-efficient" cars consumers will be compelled to buy, is, of course, completely dependent upon the correctness of the first stage of analysis, where Chief Judge Wald argues in effect that marginal adjustments of production of some cars by Ford and GM will have measurable impact on total market supply and therefore price of all competing cars.
 
 
 [7]
 That is, of course, not to suggest that petitioner might not be interested in gaining products with their desired attributes at the lowest possible price
 
 
 [8]
 One sees here how crucial is the assumption the CAFE goals marks the cutoff of the "fuel-efficient" market. If consumers treat all cars that achieve 24 m.p.g. or more as fuel-efficient, this shift across the CAFE standard will not affect supply
 
 
 [9]
 A large regulatory change could similarly be more easily assimilated by participants in the "fuel-efficient car" market if Ford and GM responded by shifting a smaller number of cars from 30 m.p.g. to 12 m.p.g. rather than a larger number from 27 m.p.g. to 25 m.p.g
 
 
 [10]
 Of course, if these allegations were made they could be challenged, and at the summary judgment stage we might have at least affidavits, if not depositions, to draw upon
 
 
 [11]
 Assertions about the behavior of individual car manufacturers in light of a rule change, on the other hand, seem to me to dovetail more precisely with the Supreme Court's causation and redressability cases. See infra Part II
 
 
 [12]
 A like asymmetry can be seen in the presumption that an agency's decision not to take enforcement action is unreviewable. Compare Heckler v. Chaney, 470 U.S. 821, 829-35, 105 S.Ct. 1649, 1654-57, 84 L.Ed.2d 714 (1985) with id. at 848-54, 105 S.Ct. at 1664-67 (Marshall, J., concurring)
 
 
 [13]
 Moreover, I am not convinced that CAS I was correct in holding that the Act's judicial review provision, authorizing suit by "[a]ny person who may be adversely affected by" the promulgation of a rule, 15 U.S.C. Sec. 2004(a), is necessarily an expression of Congress' intent to sweep away prudential standing barriers. See CAS I, 793 F.2d at 1324; see also Bread Political Action Comm. v. Federal Election Comm'n, 455 U.S. 577, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982). Petitioners' asserted interest might easily be characterized as a generalized grievance
 
 
 [14]
 One must observe that SCRAP is in important respects a procedural case as much as a standing case. The holding there was that the allegations of injury were sufficient to survive a motion to dismiss, but not necessarily summary judgment. 412 U.S. at 689, 93 S.Ct. at 2416
 
 
 [15]
 Chief Judge Wald suggests that a requirement of supporting affidavits to show the specificity of injury in cases such as this is only an empty formality, even though we ourselves have only recently employed just this device to assure ourselves of concrete injury to plaintiffs. See National Wildlife Fed'n v. Hodel, 839 F.2d at 703
 
 
 [16]
 Given the ecological interdependence of our planet's flora and fauna, harm to any part of the environment has incalculable consequences to the whole. In a sense, the Supreme Court's injury analysis in the environmental cases is a sort of risk aversion. Cf. Buckley, Three Cheers for the Snail Darter, NATIONAL REVIEW, Sept. 14, 1979, at 1144 (Senator, now Judge, Buckley noting that "extinction is one of the few processes that man cannot reverse")
 
 
 [17]
 A useful explanation of such "outsourcing" appears at 51 Fed.Reg. 35,594, 35,604 (1986)